# 1+- 4151-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

NORMA KNOPF and MICHAEL KNOPF,

*Plaintiffs-Appellants,*

*against*

FRANK ESPOSITO, DORSEY & WHITNEY, LLP, NATHANIEL H. AKERMAN, EDWARD S. FELDMAN and MICHAEL HAYDEN SANFORD,

*Defendants-Appellees,*

_____

*On Appeal from the United States District Court for the Southern District of New York*

## APPELLANTS' CORRECTED BRIEF

Eric W. Berry
Berry Law PLLC
745 Fifth Avenue, 5th Floor
New York, New York 10151
(212) 355-0777
BerryLawPLLC@gmail.com

Gary Greenberg, Esq.
666 Fifth Avenue, 27th Floor
New York, NY 10103
(212) 765-5770
gg@ggreenberglaw.com

*Attorneys for Plaintiffs-Appellants Norma Knopf and Michael Knopf*

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................. iii

Jurisdictional Statement........................................................... 1

Issues Presented...................................................................... 2

Introduction............................................................................ 4

Statement of the Case.............................................................. 9

Standard of Review.................................................................. 26

Argument................................................................................. 26

### Point I
The Knopfs Allege the Elements
of a Conspiracy to Violate §1983................................................ 26

### Point II
The Knopfs Were Injured by the *Ex Parte* Nature
of the Ruling by Espositos's Wife, Rather
Than Any First Department Orders ............................................. 29

    A.  The First Department Orders Have Uniformly
        Ordered Sanford to Deposit and Maintain
        Any Sale Proceeds in Escrow........................................ 29

    B.  The Knopfs Were Harmed by the
        *Ex Parte* Nature of the Call, Rather than
        Any First Department Ruling......................................... 31

    C.  Prejudice is Not Required to
        Establish a Due Process................................................. 37

**<u>Table of Contents (con'd)</u>**

Point III
Both Direct and Circumstantial Evidence of
    a Conspiracy Are Adequately Alleged.....................................    39

    A.   The District Court Decision Ignores What
        the Knopfs Actually Alleged and Credits
        Defendants' Self-Serving Account.............................    39

    B.   The "Innocent Coincidence" Defense
        Defense Does Not Support Dismissal...........................    43

   .C.   The Knopfs Adequately Allege that
        Esposito's Wife Joined the Conspiracy.......................    52

    D.  There is No Requirement that Each Conspirator
        Enter an Agreement with Every Other.........................    54

    E.   The Knopfs Have Satisfied this Court's
        Standards for Pleading a Conspiracy...........................    56

Point IV
The Second Version of the June 16
    Order Is Irrelevant........................................................    58

Conclusion.............................................................    62

Certificate of Compliance........................................    63

# TABLE OF AUTHORITIES

**Case**                                                    **Page(s)**

*In the Matter of Abbott*,
167 A.D.2d 617,  63 N.Y.S.2d 848 (3d Dept. 1990).....................     50

*Abulashvili v. Attorney General of U.S.*
663 F.3d 197 (3d Cir. 2011)............................................     27-28

*Adickes v. S.H. Kress and Co.*
398 U.S. 144, 90 S.Ct. 1598 (1970)................................     26-27

*American ORT, Inc. v. ORT Israel*
2009 WL 233950 (S.D.N.Y.).........................................     33

*Anderson News, LLC v. American Media, Inc.*
680 F.3d 162 (2d. Cir. 2012).........................................     48

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (1987)..........................     50-51,
                                                                          51-52

*Arbor Realty Funding LLC v. East 51st St. Dev. Co., LLC*
67 A.D.3d 559, 890 N.Y.S.2d 14 (1st Dept. 2009).........................     32

*Avon Development Enterpriser Corp. v. Samnick*
286 A.D.2d 581, 730 N.Y.S.2d 295 (1st Dept. 2001).....................     59

*Baker ex rel. Thomas v. General Motors Corp.*
522 U.S. 222, 118 S.Ct. 657 (1989)................................     58

*Bashein v. Landau*
96 A.D.2d 479, 465 N.Y.S.2d 178 (1st Dept. 1983).......................     61

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544, 127 S.Ct. 1955 (2007)...........................     26, 27
                                                                          46, 48

-iii-

| **Case** | **Page(s)** |
|---|---|
| *In Re Broiler Chicken Antitrust Litigation*<br>2017 WL 5574376 (N.D. Ill.)............................................... | 47-48 |
| *Browning v. Navarro*, 826 F.2d 335 (5th Cir. 1987).................... | 8-9, 33 |
| *Brucar v. Rubin,* 638 F.2d 987 (7th Cir.1980)............................... | 54 |
| *C&A Carbone, Inc. v. County of Rockland*<br>2010 WL 3825740 (S.D.N.Y.)........................................................ | 27 |
| *Cabrini Terrace Joint Venture v. O'Brien*<br>Index No. 570255/08...................................................................... | 60 |
| *Cangro v. Rosado*<br>2014 WL 658366 (Sup. Ct., New York Co.)................................ | 30 |
| *Carey v. Piphus*, 435 U.S. 247 98 S.Ct. 1042 (1978)..................... | 38, 38-39 |
| *Cleveland Board of Education v. Loudermill*<br>470 U.S. 532, 105 S.Ct. 1487 (1985)........................................... | 27 |
| *Colombo v. O'Connell*, 310 F.3d 115 (2d Cir. 2002)................... | 28 |
| *Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005).................... | 38 |
| *D.K. by L.K. v. Teams*, 260 F.Supp.3d 334 (S.D.N.Y. 2017)....... | 51-52 |
| *Deephaven Distressed Opportunities Trading, Ltd. v.*<br>*3V Capital Master Fund Ltd.*, Index No. 600610/08.................... | 61 |
| *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.*<br>411 F.3d 384 (2d Cir.2005)........................................................... | 31-32 |
| *Dubose v. Kelley*, 187 F.3d 999 (8th Cir. 1999)........................... | 9, 45, 48 |

**<u>Table of Authorities (con'd)</u>**

**<u>Case</u>**                                                                 **<u>Page(s)</u>**

*Federal Deposit Ins. Corp. v. Five Star Mgmt., Inc.*
258 A.D.2d 15,  692 N.Y.S.2d 69 (1st Dept.1999)........................   16n.3

*In re Feit & Drexler, Inc.*
42 B.R. 355 (Bankr., S.D.N.Y. 1984)...........................................   61

*Felix v. Brand Service Group, LLC*
101 A.D.3d 1724, 957 N.Y.S.2d 545 (4th Dept. 2012).................   61

*Ferguson v. Fergus Enterprises, Inc.*
13 Misc.2d 235, 175 N.Y.S.2d 974 (Sup. Ct., New York Co. 1958)....  61-62

*Fieldstone Capital, Inc. v. Loeb Partners Realty*
105 A.D.3d 559, 963 N.Y.S.2d 120 (1st Dept. 2013)...................   62

*Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983 (1972)..................   38

*Gelboim v. Bank of America Corp.*
823 F.3d 759 (2d Cir. 2016)...........................................................   48, 51

*Glazer & Gottlieb v. Nachman*
234 A.D.2d 105, 650 N.Y.S.2d 717 (1st Dept. 1996)....................   61

*Grossberg v. Van Bakergem*
2016 WL 283595 (Sup. Ct., New York Co.)................................   32

*Guenther v. Commissioner*, 889 F.2d 882 (9th Cir. 1989)...........   32-33

*Hines v. Thomas,* 2016 WL 4492816 (S.D. Ala.)........................   48-49

*International Controls Corp. v. Vesco*
556 F.2d 665 (2d Cir. 1977).........................................................   58

**Table of Authorities (con'd)**

**Case**                                                                 **Page(s)**

*J. Aron & Company v. Controladora Commercial*
*Mexicana S.A.B.*, Index No. 603225/10.........................................   60


*Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*
168 F.3d 347 (9th Cir. 1999)...........................................................   58


*Knopf v. Esposito*, 2017 WL 6210851 (S.D.N.Y.)........................   *passim*


*Knopf v. Phillips*, 16  Civ. 6601 (DLC).........................................   5


*Knopf v. Sanford*
New York County Index No. 113227/2009..................................   9


*Knopf v. Sanford*
123 A.D.3d 521, 1 N.Y.S.3d 18 (1st Dept. 2014).........................   10


*Knopf v. Sanford*
137 A.D.3d 662, 26 N.Y.S.3d 866 (1st Dept. 2016)......................   19, 30


*Knopf v. Sanford*
150 A.D.3d 608, 55 N.Y.S.3d 214 (1st Dept. 2017)......................   17


*Koch v. Christie's Int'l PLC,* 699 F.3d 141(2d Cir. 2012)............   43


*Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002)............................   37-38


*Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs DOL*
137 F.3d 799 (4th Cir. 1998).........................................................   33


*Lehtinen v. Bill Communications, Inc.*
1989 WL 129533 (S.D.N.Y.).........................................................   59

**Table of Authorities (con'd)**

**Case**               **Page(s)**

*M & B Joint Venture, Inc. v. Laurus Master Fund, Ltd.*
12 N.Y.3d 798, 879 N.Y.S.2d 812 (2009)..................................... 16n.3

*Maria Cognata v. Next Management, LLC*
Index No. 603225/08........................................................................ 60

*McCardle v. Haddad*, 131 F.3d 43 (2d Cir. 1997)....................... 39

*McGee v. Doe*, 568 Fed.Appx. 32 (2d Cir. 2014).......................... 57

*Mendocino Environmental Center v. Mendocino County*
192 F.3d 1283 (9th Cir. 1999)......................................................... 49

*Mennonite Board Mennonite Board of Missions v. Adams*
462 U.S. 791, 103 S.Ct. 2706 (1983)............................................. 37

*In re Motors Liquidation* Co., 829 F.3d 135 (2d Cir. 2016)
*cert den. sub nom. General Motors LLC v. Elliott*,
__ U.S. __ , 137 S.Ct. 1813 (2017)............................................. 34-37

*In re Motors Liquidation Co.*
529 B.R. 510 (Bankr., S.D.N.Y. 2015)........................................ 34

*Myers v. Markey*
74 A.D.3d 1344, 904 N.Y.S.2d 184 (2d Dept. 2010).................... 58

*In re New Concept House, Inc.*, 951 F.2d 932 (8th Cir. 1991)...... 38

*Nicosia v. Amazon.com, Inc.,* 834 F.3d 220 (2d Cir. 2016).......... 26

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir.1999).................... 27, 28

*Peralta v. Heights Med. Ctr., Inc.*
485 U.S. 80, 108 S.Ct. 896 (1988)................................................ 38

**Table of Authorities (con'd)**

**Case**                                                                    **Page(s)**

*Perry v. Blum*, 629 F.3d 1 (1st Cir. 2010)....................................    37

*Pizzuto v. County of Nassau*
239 F.Supp.2d 301 (E.D.N.Y. 2003)...........................................    55

*Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 65 S.Ct. 478 (1945).....    32

*Rescuecom Corp. v. Google, Inc.*
562 F.3d 123 (2d Cir. 2008).......................................................    26

*Ross v. American Express Co.*
35 F.Supp.3d 407 (S.D.N.Y. 2014)..............................................    51

*Savings and Loan Ass'n of Kingston v. Berberich*
24 A.D.2d 187, 264 N.Y.S.2d 989 (3d Dept. 1965)....................    16n.3

*Seven Seas Petroleum, Inc. v. CIBC World Markets, Corp.*
2010 WL 2277489 (S.D. Tex.).....................................................    44-45

*Sparks v. Dennis*, 449 U.S. 24, 101 S.Ct. 183 (1980) ..................    8-9

*Starr v. Sony BMG Music Entertainment*
592 F.3d 314 (2d Cir. 2010).......................................................    26, 48

*In re Text Messaging Antitrust Litigation*
630 F.3d 622 (7th Cir. 2010).......................................................    52

*In re Trafalgar Associates*
53 B.R. 693 (Bankr., S.D.N.Y. 1985)..........................................    61

*United States v. Abuhamrra*, 389 F.3d 309 (2d Cir. 2004)...........    27

## Table of Authorities (con'd)

**Case**                                                                   **Page(s)**

*United States v. Apple Inc.*
952  F. Supp. 2d 638 (S.D.N.Y. 2013)..........................................   55-56

*United States v. Apple, Inc.,*  791 F.3d 290 (2d Cir. 2015)...........   55

*United States v. Fontana,* 528 F.Supp. 137 (S.D.N.Y.1981)........   16n.3

*United States v. City of New York*, 359 F.3d 83 (2d Cir.2004).....   26-27

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995)...............   55

*United States v. Manarite*, 448 F.2d 583 (2d Cir. 1971)..............   55

*United States v. Pacchioli*, 718 F.3d 1294 (11th Cir. 2013)..........   47

*United States v. Taggert*, 2010 WL 532530 (S.D.N.Y.)...............   55

*United States v. Zabare*, 871 F.2d 282 (2d Cir. 1989).................   57-58

*Uthman v. Obama*, 637 F.3d 400 (D.C.Cir.2011)........................   47

*West v. American Telephone and Telegraph Co.*
311 U.S. 223, 61 S.Ct. 179 (1940)................................................   59

## Table of Authorities (con'd)

**Page(s)**

## United States Code

11 U.S.C. §363.................................................................... 33, 34, 36

15 U.S.C. §1....................................................................... 47

28 U.S.C. §1291.................................................................. 1

28 U.S.C. §1331.................................................................. 1,

28 U.S.C. §1332.................................................................. 1

28 U.S.C. §1367.................................................................. 1

42 U.S.C. §1983.................................................................. *passim*


## Federal Rules of Civil Procedure

Fed. R. Civ. P. 12(b)(6)....................................................... *passim*


## Civil Practices Laws and Rules

CPLR 2221(a)..................................................................... 32

CPLR 2221(d)(2)................................................................. 32

CPLR 5518......................................................................... 23

CPLR 5519(c)..................................................................... 23, 59

**Table of Authorities (con'd)**

**Page(s)**

**New York Miscellaneous**

22 NYCRR Part 1200, Rule 3.5(a)(2)(i)-(iii)................................    44, 49

Advisory Committee on Judicial Ethics, Opinion 15-69.............  53, n10

**Articles/Treatises**

Areeda & Hovenkamp, *Antitrust Law*,
Vol. 4, ¶1425, p. 187 (4th ed.)..........................................................    45, 46, 53

Mark Davies, *et al.*, *New York Civil*
    *Appellate Practice* (2d ed. 2007)........................................    23

Hernandez, "2 L.I. Men Die in Connecticut Plane Crash,"
The New York Times, December 22, 2002....................................    9n.1

Robert M. Lawless, "Realigning the Theory and Practice
of Notice in Bankruptcy Cases,"
29 *Wake Forest Law Rev.* 1215 (1994).........................................    37

James M. McGuire & Steven E. Engel,
"'Stay' for Awhile: CPLR 5519(c) Stay Applications
    in the First Department,"
*New York Law Journal*, August 27, 2012........................................    23-24, 60

David B. Saxe, "The Under-the-Radar Work
    of the Appellate Division,"
*New York Law Journal*, July 22, 2016......................................    10n.3, 21-
                                                          22, 22n.7

David B. Saxe, "How We Operate at the Appellate
    Division, First Department: An Insider's View,"
*New York Law Journal*, July 22, 2016 ....................................    18n.4

# JURISDICTIONAL STATEMENT

The federal question in this case arises under the Civil Rights Act of 1871, 42 U.S.C. §1983 (SA25) which creates legal and equitable remedies for violation of federal rights committed under color of state law.

The District Court had subject matter jurisdiction over the §1983 claim, which alleges a conspiracy to violate appellants' civil rights, pursuant to 28 U.S.C. §1331 (jurisdiction over federal questions). It had jurisdiction over the state law claims under both 28 U.S.C. §1332 (diversity of citizenship) and the supplemental jurisdiction statute (28 U.S.C. §1367).

Appellate jurisdiction lies under 28 U.S.C. §1291 over a final judgment (SA22).

This appeal is from a Clerk's Judgment (*id.*) entered on December 13, 2017. The appeal brings up for review the Opinion and Order, dated and entered December 7, 2017 (SA1-SA23) which dismissed the Knopfs' §1983 claim pursuant to Fed. R. Civ. P. 12(b)(6), and dismissed the pendent state law claims without prejudice, purportedly in accordance with 28 U.S.C. §1367(a) based on the dismissal of the federal claim. The latter ruling, which the Knopfs are not appealing, overlooks that the Knopfs, who are South Carolina residents, also invoked diversity jurisdiction. (A111-A112, ¶18.)

The Decision is not officially reported, but available on Westlaw at 2017 WL

6210851.

The Notice of Appeal (SA24) was filed on December 28, 2017.

## ISSUES PRESENTED

(1)  Whether a failure to give an adversary notice of an oral application for declaratory-type relief violates the due process requirement of notice and an opportunity to be heard, when the oral application is successful and used to the detriment of the adversary.

The District Court implicitly answered this question in the negative.


(2)  Whether an exceedingly remote possibility that harm to the plaintiff was caused by a coincidence, rather than defendants' collusion, requires dismissal of a conspiracy claim.

The District Court implicitly answered this question in the affirmative.


(3)  Whether a traditional conspiracy – rather than parallel conduct and "plus factors" – is adequately alleged if the ensuing events would not have occurred but for an improper agreement among the defendants.

The District Court implicitly answered this question in the negative.

(4) Whether allegations of parallel illegal activities, together with numerous "plus factors," including "meetings among defendants" and "common financial motives," is sufficient to circumstantially plead a conspiracy claim.

The District Court implicitly answered this question in the negative.

(5) Whether a District Court is permitted to dismiss under Fed. R. Civ. P. 12(b)(6) because it views the plaintiff's theory as the less probable of two plausible explanations.

The District Court implicitly answered this question in the affirmative.

(6) Whether, in reviewing a motion to dismiss under Rule 12(b)(6), a District Court is permitted to ignore the allegations in the complaint in favor of the defendant's version of the facts.

The District Court implicitly answered this question in the affirmative.

(7) Whether, if a District Court elects to consider material extraneous to the complaint when reviewing a Rule 12(b)(6) motion, it may consider only that cited by one party, and ignore that submitted by the other.

The District Court implicitly answered this question in the affirmative.

# INTRODUCTION

In 2016 defendant Michael Sanford paid $107,500 for a favorable *ex parte* "advisory opinion," as the District Court characterized the *quid pro quo*, that was provided by a New York State Court attorney employed by the Appellate Division, First Department.  Sanford then used the *ex parte* advisory opinion to avoid the "impediments" posed by two First Department orders to his selling an apartment at 44 East 67th Street in Manhattan. As Sanford and his in-contract buyer both understood them, those orders required Sanford to escrow the proceeds of any sale of the apartment that occurred prior to the determination of an appeal that Norma and Michael Knopf then had pending before the First Department.

The Court attorney responsible for the *ex parte* opinion is married to defendant Frank M. Esposito. (The Knopfs are not using the Court attorney's name in this brief, nor did they in their pleadings below.)  One day before the Court attorney provided her advisory opinion, Sanford hired Esposito, a lawyer, admittedly to assist him in overcoming the obstacles imposed by the two First Department orders.  Esposito agreed to accept a $55,000 payment when Sanford became "liquid," *i.e.*, when the apartment was sold.  Sanford was not pursuing mere access, he was seeking – and received – a specific interpretation from Esposito's

wife concerning the two orders.  She provided the advisory opinion,  even though, as she has admitted, she hadn't seen one of the orders at issue and didn't understand the other.  She enunciated this opinion during a conference call with defendants Nathaniel H. Akerman and Edward Feldman, lawyers who called her at Sanford's direction, though neither had appeared in the appeal.

The Knopfs' attorneys were not advised of, or included on, the call, a clear due process violation.  As a result, the Knopfs – who had financed Sanford's purchase of the 67th Street property – lost $2.2 million dollars.

The Knopfs are not typical civil rights plaintiffs; they are an elderly couple who  entrusted $11.6 million – their life savings – to Sanford. They hardly lack legal credibility; they have prevailed in four of five appeals in their state court dispute with Sanford, and obtained a judicial hearing officer's report that Sanford owes them $10.9 million (but still no final judgment).

These events are not a matter of speculation; they are documented and admitted under oath – indeed, boasted about – by the defendants. Sanford, Akerman, Feldman, Esposito, the Court attorney and former Appellate Division Justice James M. McGuire, were all deposed in a related case, *Knopf v. Phillips*, 16 Civ. 6601 (DLC), and much of the testimony was filed below.  The record also includes Sanford's January 11, 2016 agreement that he would pay Esposito

$55,000 (A203-204); Feldman's January 12, 2016 memo summarizing Esposito's wife's *ex parte* advisory opinion (A221); and checks totaling $102,500 paid to Esposito out of the proceeds of the sale his wife illegally facilitated (A377).

All the Knopfs need to prove in this case is admitted in a single document, Feldman's *pro se* memorandum of law. That memo admits that Feldman agreed to Sanford's request that he call the First Department to obtain clarification of the orders because "Feldman decided that it was not for him to interpret the language of the TRO [*sic:* escrow order]. As such, no closing could be scheduled until either the TRO was removed or the language clarified." (A481.) Therefore, "[t]he morning of January 12, 2016, Akerman called Feldman and then conferenced in the Appellate Division. . . ." (A482.) This was because Akerman, too, wanted to: "call the Appellate Division to confirm or refute []his understanding." *Id.* After learning the alleged view of the Court that no restraints and no escrow requirement remained, Sanford and Phillips closed. Feldman openly admits that the decision to close was based on government action – the advice they received from a Court attorney on their January 12 call: "This conference call lasted but a few minutes. Then, *based upon this call*, the closing took place and the proceeds were distributed." *Id.* (emphasis added).

Having sought, obtained and relied on the intervention of a government actor

– Esposito's wife – defendants need to show both that she was a "neutral arbiter," and that the Knopfs were given notice of the application made to her. (Point I, *infra*.) Obviously, she was not neutral, given her marriage to Esposito and Sanford's written promise the day before the *ex parte* call to pay Esposito $55,000 when he became liquid. The Court attorney also, euphemistically, "prejudged" the issue, having informed Esposito a few days earlier that she would opine that Sanford was not "aggrieved" by the orders, even though, as she has admitted, she had not seen one of them, and didn't understand the other. The Knopfs' attorneys were not given notice of or an opportunity to be heard on the call. Had they been, they would have known that Sanford intended to sell without escrowing the proceeds, and would have obtained immediate relief from an actual judge the next day, just as they have on many other occasions. (Point II.)

The District Court ignored the allegations in the amended complaint (A103-166), defendants' numerous admissions regarding their agreement and improper purpose, documentary evidence substantiating the Knopfs' claims and the relevant law. It incorrectly concluded that it was a mere "coincidence" that Akerman and Feldman, acting on Sanford's behalf, had ended up speaking to, out of the at least 50 Court attorneys employed in the First Department, the one who was married to Sanford's lawyer and financially interested in assisting Sanford. (Point III-A.)

The District Court held that the Knopfs had not plausibly alleged that the Court attorney "was a member" of a conspiracy when she received the call. The holding is contradicted by the Court Attorney's admissions in her deposition in *Phillips* that a week before the call she had advised her husband that she would opine that the orders did not mean what they seemed to mean. (A121, ¶51; A718:31-A719:17.) The finding of implausibility ignored the obvious point that, had the Court attorney *not* been in on the scheme, she would have either promptly terminated the call, recused herself after learning that it concerned her husband's client or, at minimum, insisted that the Knopfs' attorneys be added to it. (Point III-B.)

Prior to the outcome below, not once in the 147 years since the federal Civil Rights Act was enacted, indeed not once since the Fourteenth Amendment was adopted, has a federal judge *ever* suggested that a successful effort to corrupt a state's judicial system, or even *ex parte* substantive communication between a judicial officer and one party to the detriment of the other, would not violate due process or federal civil rights. Instead, such events are adjudged conspiracies to violate §1983. *Sparks v. Dennis*, 449 U.S. 24, 101 S.Ct. 183 (1980) (alleged bribery of state court judge by non-judicial defendants); *Browning v. Navarro*, 826 F.2d 335, 345-346 (5th Cir. 1987) (allegations that a judge engaged in private

conferences with plaintiffs); *Dubose v. Kelley*, 187 F.3d 999, 1003 (8th Cir. 1999) (where attorneys and the judge made *ex parte* statements supporting the inference that they had agreed to "fix" a trial).  (Point III-C.)

## STATEMENT OF THE CASE

In 2000, the Knopfs contributed $11,607,810 to Sanford's so-called hedge fund, becoming its sole investors.  (A1326:25-A1327:12.)  In 2002, the Knopfs lost their son, Paul, in a plane crash[1], and Sanford ingratiated himself into their family. Between 2003 and 2006, the Knopfs made five loans to Sanford and his companies. One, in the amount of $1,690,860, financed Sanford's purchase, through his company, Pursuit Holdings, LLC, of an apartment at 44 East 67th Street (the property at issue here).   Sanford used another, $3.25 million, loan to  acquire townhouse units at 10 Bedford Street. (A115, ¶28.)

Sanford repeatedly breached promises to repay and collateralize the loans. In 2009 the Knopfs commenced an action, *Knopf v. Sanford*, New York County Index No. 113227/2009, in which they sought to enforce the loan agreements. (A115-116, ¶30.)

---

[1] Hernandez, "2 L.I. Men Die in Connecticut Plane Crash," *The New York Times*, December 22, 2002, available at www.nytimes.com/2002/12/22/nyregion/2-li-men-die-in-connecticut-plane-crash. html, last accessed November 4, 2016 (hyperlinks are active in the digital version of this brief).

On December 11, 2014, the First Department granted the Knopfs summary judgment on all five loan agreements, including that which financed Sanford's acquisition of the 67th Street apartment. However, the decision did not award damages, direct entry of judgment or schedule a damages hearing. *Knopf v. Sanford*, 123 A.D.3d 521, 1 N.Y.S.3d 18 (1st Dept. 2014)

Shortly after the grant of summary judgment, the state trial court (Tingling, J.S.C.) terminated, without explanation, the notices of pendency that the Knopfs had filed against the 67th Street and Bedford properties. (A117-118, ¶33.)

Following these state court rulings, the Knopfs pursued entry of a damages in the state trial court, while Sanford refinanced, and attempted to sell the 67th Street property to an individual, Michael Phillips, both to generate money for attorneys fees and to liquidate the asset so as to transfer it beyond the Knopfs' reach before they obtained judgment. The Knopfs opposed Sanford's efforts to sell the property. In early 2015 they filed an appeal from the cancellation of the notices of pendency and, in the trial court, a motion for a pre-judgment attachment. In those proceedings they obtained several stays, TROs and preliminary injunctions prohibiting the sale of the property. However, in July 2015, both the appeal and the motion for a prejudgment attachment were denied, and the stays and preliminary injunctions expired. (A116, ¶33 - A118, ¶38.)

On July 23, 2015, the Knopfs noticed an appeal from the denial of their attachment motion. (A118, ¶38.)  On July 24, they moved in the First Department for a preliminary injunction prohibiting the sale of the property pending that appeal ("the July 24 motion"). *Id.*, ¶39.   However, they did not obtain an immediate stay of the sale. On October 22, the Knopfs filed, in the First Department, a motion for reargument and reinstatement of a notice of pendency against the 67th Street property ("the October 22 motion"). (*Id.*, ¶42.)   In connection with the October 22 motion and, the same day they filed it, the Knopfs obtained an interim order from First Department Justice John M. Sweeny (A216) which required the proceeds from any sale of the property to be paid into escrow ("the escrow order").  (A118-119, ¶43.)

Phillips, Sanford's in-contract buyer, viewed Justice Sweeny's escrow order as a cloud on title, and Sanford refused to close on terms that required the proceeds to be escrowed. (A119,  ¶44; A120, ¶47.)

On November 12, 2015, the First Department issued an order (A217) denying the earlier July 24 motion for a preliminary injunction.  That order did *not* decide, address or even refer to the October 22 motion that had occasioned Justice Sweeny's escrow order.  (A119, ¶46.)

On November 20, 2015, at Phillips' urging, Sanford cross-moved to vacate

the October 22 escrow order (A120, ¶47; A588-641), arguing that the November 12 ruling on the July 24 motion had terminated the October 22 escrow order as a matter of law. (A26, ¶47; A604; A627-628.)  On December 29, 2015, a First Department panel, which included Justice Sweeny, denied that cross-motion. (A220; also A27, ¶49; A105-106, ¶12.)

Phillips continued to refuse to close, citing the December 29 order (A220) denying the cross-motion to vacate the escrow order. (A120, ¶47.)

On January 2 or January 3, 2016, Sanford and Esposito met in Oyster Bay, and negotiated fee arrangements.  Sanford gave Esposito copies of Justice Sweeney's escrow order and the December 29 ruling which denied the motion to vacate that escrow order.  (A120, ¶¶50-51.)  Sanford agrees that he "absolutely" made Esposito aware of his need to overcome the orders impeding his sale of the property.  (A120, ¶48; A1345:18-A1350:31.)

On approximately January 4, Esposito showed the December 29 ruling, but not the October 22 order, to his wife, who was employed as a "Special Master" in the First Department's "Pre-Argument Conference Part," a mediation section similar to this Court's CAMP.  A120-121, ¶51.

The Court attorney advised Esposito that she would opine that Sanford was not actually aggrieved by these orders, and that the December 29 ruling had

terminated the earlier escrow order (even though it *stated* that Sanford's motion to vacate the escrow order had been denied). (A121, ¶51; A718:31-A719.)  However, she had not seen the October 22 order. (A109-110, ¶14(k); A149, ¶133(k), A150; A720:14-16.)[2]  She later testified, with respect to the December 29 order, "I have no way of knowing what the Judges of the Court were thinking when they drafted that order." (A726:6-16; A121, ¶51.)

On January 11, Esposito and Sanford concluded a written agreement (A203-204) in which Sanford promised to pay Esposito a one-time $55,000 fee, although no money changed hands at the time. (A121-122, ¶52.)  Both Sanford and Esposito acknowledge that the intention was that Esposito would only be paid when Sanford achieved "liquidity." *Id*.

Also on January 11, Sanford provided Akerman with copies of the October 22, November 12 and December 29 orders. Sanford directed Akerman and Feldman, to contact the First Department to obtain a clarification of whether the escrow requirement remained in effect.  (A122, ¶53, 133(c); A499:3-7; A633:2-A633:17.)

---

[2]In a passage from the Court Attorney's deposition in *Phillips* that was not filed below, she states that she had not even seen Justice Sweeny's escrow order at any point prior to the August 15, 2017  deposition date.  (Transcript, p. 35, lines 7 -12.)  The Knopfs  will file the testimony if requested.

The next day, January 12, Akerman emailed Feldman to set up a call with the Appellate Divsion. (A655.)   As Feldman has admitted, Akerman already knew that, when they contacted the Appellate Division, they would be told that the October 22 escrow order had been dissolved "as a matter of law."

> I did a file memo, *and I gave a copy of it where [Akerman] called me and said he was advised by the Appellate Division that the restraints were dissolved as a matter of law, and I said, fine, and then when he knew I was on the phone, he called the Appellate Division*, and we -- excuse me. And he asked for the clerk, and we got transferred once or twice, and we talked to this nice lady. She said she was the Court attorney, whatever, and she confirmed, yes, that the denial of the motion resulted in the dissolution of all restraints, and we can close.

A432:11-19 (emphasis added); A152, ¶136(b).

The "nice lady" in Feldman's account was Esposito's wife.   Defendants have not attempted to explain why Akerman and Feldman might be transferred to a Court attorney in the mediation part, when the *Knopf v. Sanford* appeal had not been ordered to mediation. Akerman and Feldman identified themselves as Sanford's attorneys.  Esposito's wife was immediately aware that they represented her husband's client  (A508:15-17; A714:10-15) and told them she "was familiar with the order [they] were speaking about" (A515: 22-23).  She nevertheless did not recuse herself from the call, or require that the Knopfs' attorneys be added to it. Instead, after a "minute and one-half" of silence (A502:3-21), she proceeded to

advise Akerman and Feldman that the October 22 and December 29 orders were not impediments to a sale of the property, and that the cash received from a sale would not have to be escrowed.  (A509:6-17; A651:17-652:5; A759, ¶9(C).)  As Akerman had anticipated, she purported to opine that the October 22 escrow order had been dissolved as a matter of law.  (A651:17-A652:2; *also:* A109,¶14(h), A122, ¶54-A124, ¶58, A124, ¶60; A221.)  She provided this opinion even though she still had never seen the October 22 order and didn't understand that of December 29. *See* p.13 & n.2, *supra*.

On January 12, 2016, both Feldman and Akerman wrote file memoranda recording their conversation with Esposito's wife. Feldman's memo (A221), was forwarded to Phillips' attorneys. (A454,  p. 26, line 26.)  Based on Feldman's memo, Phillips agreed to close. (A125, ¶62, A126, ¶¶66- 67, A132, ¶76;  A482; A733:7-17 & A734: 2-10 (Phillips closed relying on "something in January").)

On January 14, 2016, a hearing on the Knopfs' damages began before the Hon. Ira Gammerman, a retired state court judge designated a "judicial hearing officer," similar to a federal magistrate.  (A130, ¶72)

Also on January 14, Esposito's wife used her official www.nycourts.gov. account to email James M. McGuire, Esq., a former First Department justice for whom she had clerked, to ask McGuire whether he was interested in appearing as

Sanford's attorney. (A657-662; A125, ¶64.)  Sanford and McGuire, who was then at Dechert, communicated on January 15 but did not reach an agreement.  (A130, ¶73-A131, ¶74.).

On January 19, Sanford paid Esposito $5,000 of the promised $55,000. (A351.)

The sale to Phillips closed on February 1, 2016 at a price of $3 million. Phillips' attorney distributed the money to Sanford and several alleged creditors (A346, ¶42), but not to the Knopfs, though the Knopfs' claim to the proceeds was superior to those of these transferees.[3]

Also on February 1, Sanford emailed McGuire offering Dechert $500,000 as an initial retainer, which McGuire accepted.  (A126, ¶68; A130-131, ¶73; A132,

---

[3]The Knopfs as purchase money lenders, had an equitable lien against the properties that supports tracing through to all substituted proceeds – such as the cash paid by Phillips –  by means of either a constructive trust or an equitable mortgage. (They demand a constructive trust in their state court complaint.) That equitable lien has priority over both the claims of subsequent contract creditors, and the tax and condominium liens paid out of the proceeds. *M & B Joint Venture, Inc. v. Laurus Master Fund, Ltd.*, 12 N.Y.3d 798, 800, 879 N.Y.S.2d 812, 814 (2009) ("New York law allows the imposition of an equitable lien if there is an . . . agreement 'that there shall be a lien on specific property[.]'"); *Federal Deposit Ins. Corp. v. Five Star Mgmt., Inc.*, 258 A.D.2d 15, 21, 692 N.Y.S.2d 69, 73 (1st Dept.1999) ("an equitable mortgage .  . . is entitled to a preference over subsequent judgment creditors"); *accord: Savings and Loan Ass'n of Kingston v. Berberich*, 24 A.D.2d 187, 189, 264 N.Y.S.2d 989, 991 (3d Dept. 1965); *United States v. Fontana*, 528 F.Supp. 137 (S.D.N.Y.1981) (lien of constructive trust superior to subsequent tax lien).

¶77.) Esposito received checks out of the sale proceeds (A337) totaling $102,500, bringing his payments from Sanford to $107,500.

On February 8, JHO Gammerman found that Sanford owed the Knopfs $10,937,850, and Pursuit jointly liable for $8,336,488 of that amount. A133-134, ¶80. The Knopfs' motion to confirm that report and reduce it to judgment has not been determined, though on May 25, 2017 the First Department ordered the trial court to address it on its merits. *Knopf v. Sanford*, 150 A.D.3d 608, 610,55 N.Y.S.3d 214, 216 (1ˢᵗ Dept. 2017).

The Knopfs learned of the sale and Sanford's failure to escrow the proceeds on February 24, 2016. The next day, February 25, they moved for a preliminary injunction mandating that the remaining proceeds, including the retainer paid to Dechert, be paid into escrow, and to hold Sanford in contempt of the October 22 order. On February 25, they also obtained a new escrow order from Justice Karla Moskowitz, which stated:

> Money remaining as of today at 3:45 pm from sale of
> 1-bedroom apartment shall be placed in escrow as had been directed
> by Justice Sweeny in his 10/22/15 interim order, vacatur or *which was
> denied by this Court's 12/29/2015 Order* (M-5459, M-5942) pending
> hearing and determination of this motion by full panel and
> determination.
>     Expedite motion & decision.
>     Pending hearing by full panel, money escrowed shall be
> escrowed with JP Morgan Chase or similar commercial Bank in New

York City by close of business on 2/29/2016.

(A225; A134-135, ¶81)

At the February 25 appearance, Sanford (through McGuire) argued, as he had in his cross-motion, that the intervening November 12 ruling terminated the October 22 escrow order. Justice Moskowitz rejected the argument, and she undoubtedly knew what was intended by the November 12 ruling since she was the "Justice, Presiding" on the November 12 panel. (A217.) She also rejected Sanford's argument that the December 29 decision had denied the cross-motion to vacate "as moot," commenting "we don't deny motions as moot without saying so." A134, ¶81.[4] Sanford then transferred $436,227.32, but no portion of the retainer deposited with Dechert, into the Moskowitz-ordered escrow. The rest of the $3 million had been dissipated (A135, ¶82). Had the Knopfs' attorneys been on the January 12 call, they would have learned of Sanford's intention to sell without escrowing the proceeds, and obtained the same sort of new escrow order Justice Moskowitz issued on February 25, and done so before the dissipation of the asset.

---

[4]Saxe, David B. Saxe, "The Under-the-Radar Work of the Appellate Division," *New York Law Journal*, July 22, 2016 ("Newly designated justices are often surprised, as I was, to find that there is no court reporter available to stenographically record arguments on interim applications."), available at https://www.law.com/newyorklawjournal/almID/1202576098782/How-We-Operate-at-the-Appellate-Division-First-Department-An-Insiders-View/

On March 8, 2016, Sanford and Dechert opposed the Knopfs' contempt motion and their request for the transfer of the Dechert retainer to the Moskowitz-ordered escrow. Sanford invoked an advice of counsel defense, contending that he relied on two written attorney opinions that the October 22, 2015 escrow order did not remain in effect. (As it turned out, these "opinions" were the file memoranda Feldman and Akerman had written on January 12 summarizing their call with Esposito's wife.) Sanford also offered to provide these "attorney opinions" to the First Department, but only on an *in camera* basis. (A135, ¶83; A137, ¶87.)

On March 24, 2016, the First Department decided the Knopfs' appeal from the denial of their motion for a prejudgment attachment (the appeal which had been noticed on July 23). *Knopf v. Sanford*, 137 A.D.3d 662, 663, 26 N.Y.S.3d 866 (1st Dept. 2016). The decision granted the Knopfs a preliminary injunction prohibiting Sanford's company, Pursuit "from transferring, or further diminishing, impairing or encumbering the properties it acquired with real estate loans from plaintiffs, . . . as well as any proceeds derived from the sale of such properties prior to the date of this order[.]" That injunction froze both the $436,227.32 in the escrow ordered by Justice Moskowitz and the unused $365,849.05 portion of Dechert's retainer. A135, ¶82. However, the decision did not address the Knopfs' requests for contempt citations and to have the Dechert retainer transferred to the Moskowitz

19

ordered-escrow, and those requests remained *sub judice*.

In the state trial court, Akerman and Feldman filed affirmations, dated March 16 and March 14, 2016 respectively (A753-756; A757-762), purporting to describe their January 12 communications with the Court attorney. However, these memoranda did not identify her by name, and the Knopfs did not yet know of the existence or role of Esposito and his wife.

On May 16, 2016, while the Knopfs' contempt application and request for the transfer of the Dechert retainer to escrow remained *sub judice*, the First Department contacted McGuire and requested the purported "advice of counsel" memoranda that McGuire had proffered on an *in camera* basis. McGuire, on behalf of Sanford, filed the Akerman and Feldman memoranda with the First Department without providing them to the Knopfs. The Knopfs requested that the First Department order these memoranda to be turned over to them, since a clear waiver of any privilege had occurred, but that request was ignored (A137, ¶87.) Critically, Sanford did not disclose to the Court (or the Knopfs) that the Court attorney identified and whose views were summarized in these file memos was married to someone employed by Sanford, and financially interested in the matter. (A138, ¶91.)

On June 16, 2016, the First Department released an order (A226) denying the

Knopfs' contempt motion. Regarding the request that the Dechert retainer be transferred into the Moskowitz-ordered escrow, the decision stated that the issue had already been resolved by the May 24, 2016 decision (which had already frozen that part of the proceeds). The decision was released at approximately 12:00 noon, when the First Department customarily issues its motion decisions by uploading them within a single PDF file on its website. Sometime within the next five days (but unbeknownst to the Knopfs at the time), a revised version of the order (A227) was embedded in the then-existing June 16 PDF, resulting in a subsequent version of the PDF.[5] The metadata for the revised version of June 16 PDF indicates that the document was modified on June 21.[6] As two of Sanford's attorneys, McGuire and Daniel Goldberg, Esq., have agreed, the revised order was never released by the Court. (A1555-1556, ¶5; A1558:16-A1559:3.)

The original version of the June 16 order is typical of First Department rulings on motions. The second version is dramatically different.

Like most First Department orders on motions, the original June 16 ruling

---

[5] The revised June 16 PDF can be accessed at: http://www.courts.state.ny.us/courts/AD1/calendar/appsmots/2016/June/june.shtml, select "June 16,"); then select "Motion"

[6] The metadata for the June 16 PDF (*see* prior footnote) can be accessed using Adobe Acrobat 10 or 11 (select: file/select: properties) and indicates that if was modified on June 21.

doesn't provide any reasoning for its denial of the contempt application. Hon.

David B. Saxe, "The Under-the-Radar Work of the Appellate Division," *New York

Law Journal*, July 22, 2016 ("Unlike appellate decisions, motions are disposed of

solely by order, with no written decision explaining our reasoning.")[7] The revised

version supplies a reason which, as discussed below, is identical to that which the

Feldman file memo – *i.e.* the document received by the First Department on an *in

camera* basis – attributes to Esposito's wife. The revised version is linguistically

different from every other order on motions issued by the First Department. While

the original version includes the standard introductory dependent clause used by

the First Department in its orders on motions "Plaintiffs-appellants having moved. .

. ." and "defendants having cross-moved," the "having moved"/"having cross-

moved" language does not appear in the revised version. Approximately 50,000

orders on motions – as distinct from decisions on appeals – are included in the

PDFs linked to the First Department website. The "having moved" introductory

dependent clause is included in *every one* of them, except for the revised version of

the June 16, 2016 Order. A140, ¶98. Likewise, the introductory clause, "Now, upon

reading and filing the papers with respect to the motion, and due deliberation

---

[7]available at
https://www.law.com/newyorklawjournal/almID/1202763318990/The-Under-The-Radar-Work-Of-The-Appellate-Division/

having been had thereon, it is Ordered. . . ." appears in every single one of these approximately 50,000 orders, *except for* the revised version of the June 16 decision. *Id.*, ¶99.[8]

The second version of the June 16 ruling  refers to the October 22 escrow requirement as a "temporary restraining order . . . ('TRO')" (A227), which it patently was not, and is the only instance in the First Department's database of orders where the term "temporary restraining order" or TRO is used to refer to one of that court's own rulings granting interim relief.   Elsewhere, the term used is "interim order," "interim relief" or "interim stay." (*E.g.*, A285-A306).  An "interim stay" is *not* considered a TRO in New York appellate practice. Mark Davies, *et al.*, *New York Civil Appellate Practice* (2d ed. 2007) §§9.5, 9.7 (distinguishing between "interim stays" and "temporary restraining orders" pursuant to CPLR 5518);  James M. McGuire & Steven E. Engel,  "'Stay' for Awhile: CPLR 5519(c) Stay Applications in the First Department," *New York Law Journal*, August 27, 2012 ("Unlike the statutes governing other forms of injunctive relief – temporary restraining orders and preliminary injunctions – CPLR 5519(c) does not specify

---

[8]The report of Robert A. Leonard, Ph.D., the head of Hofstra's forensic linguistics department (A228-267), sets forth the other ways in which the revised version of the June 16 order differs from the First Department's standardized format and language.

any criteria governing the issuance of a stay.")

In *Phillips*, the Knopfs obtained Feldman's January 12 file memo *via* a non-party subpoena on June 21, 2017. Feldman's memo (A221) identified the Court attorney by name, and attributed to her a legal conclusion that was identical to that contained in the revised version of the June 16 order. *Compare* the revised June 16 order, A227 ("The motion for contempt is denied because the TRO was vacated once plaintiffs' prior motion for a preliminary injunction was denied.") *with* Feldman's memo, A221 (ascribing to Esposito's wife the view that "Once full panel decided the motion and entered the November 12, 2015 Order denying the restraints, all restraints were vacated. There was no need for the motion to remove interim restraints as they were already gone. The motion was denied as a matter of law as there were no restraints to vacate and, thus the motion requested relief that could not be granted.")

The First Department would not have taken the unprecedented step of requesting an *in camera* submission of the Akerman/Feldman memos had it not viewed the issue as close. Sanford and McGuire hoped that Esposito's wife's analysis, as described in the Feldman/Akerman memos, would be persuasive, and it appears that it was. The First Department was entitled to know that the Court attorney who provided the reasoning summarized in those memos, and which

Sanford relied on in ignoring the two orders, was married to a person Sanford employed. Nevertheless, Sanford concealed that information.   A137, ¶88 - A138, ¶92.

As detailed in Point IV, *infra*, even apart from its apparent irregularities, the revised version of the June 16 order does not undermine the Knopfs' claims. On June 19, 2017, the Knopfs moved in the First Department to vacate the revised version of the June 16, 2016 order.  (A677-A701.)  The  motion was based on its procedural and linguistic irregularities, and was made before the Knopfs knew the role of Esposito and his wife, since the Knopfs had not yet obtained Feldman's memo. *Id.*

On June 26, 2017, five days after the Knopfs' learned the Court attorney's identity, McGuire gave a deposition in  *Phillips*, and revealed that Esposito's wife had clerked for him when he was on the Appellate Division, that he had been introduced to Sanford by Esposito, and that the Court Attorney and Esposito were married. A703: 6-22; A705:3-24.

On August 14, 2017, the Knopfs filed reply papers in support of their motion to vacate the second version of the June 16 order (A568-581), and disclosed what they had learned in the *Phillips* discovery. However, the motion to vacate was denied by the First Department on November 2 without stating a reason.  (A567.)

## STANDARD OF REVIEW

Under Rule 12(b)(6), a pleading is construed in the light most favorable to the plaintiff, accepting as true all well-pleaded facts, and drawing all possible inferences in the plaintiff's favor. *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2008). Factual disputes are not to be resolved. *Id.*

A court, of course, is required to determine that the plaintiff's allegations are plausible (*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1973 (2007)), "accepting all factual allegations as true, but giving no effect to legal conclusions couched as factual allegations" (*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010)).

On appeal, a Rule 12(b)(6) dismissal is reviewed *de novo*. *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230 (2d Cir. 2016).

## ARGUMENT

### Point I

### The Knopfs Allege the Elements of a Conspiracy to Violate §1983

"Complaints alleging civil rights violations must be construed especially liberally." *United States v. City of New York*, 359 F.3d 83, 91 (2d Cir.2004).  A private party may incur liability under §1983 when acting as "a willful participant

in joint activity with the State or its agents." *Adickes v. S.H. Kress and Co.*, 398

U.S. 144, 152, 90 S.Ct. 1598, 1606 (1970).  To prove a §1983 conspiracy, "a

plaintiff must show:  (1) an agreement between two or more state actors or between

a state actor and a private entity; (2) to act in concert to inflict an unconstitutional

injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999).  A §1983 conspiracy claim

must contain "enough factual matter (taken as true) to suggest that an agreement

was made."  *C&A Carbone, Inc. v. County of Rockland*, 2010 WL 3825740,* 6

(S.D.N.Y.) (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

Here, the Knopfs allege a deprivation of their right to notice and an

opportunity to be heard based on the *ex parte* nature of the call. They also assert a

denial of their right to a neutral judicial decision-maker, given the Court attorney's

marriage to a person in Sanford's employ and her financial interest in the case.

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546. 105 S.Ct. 1487,

1496  (1985) ("The opportunity to present reasons, either in person or in writing,

why proposed action should not be taken is a fundamental due process

requirement."); *United States v. Abuhamrra*, 389 F.3d 309, 321 *et seq.* (2d Cir.

2004) (substantive *ex parte* communications violated the non-participating party's

due process rights); *Abulashvili v. Attorney General of U.S.*, 663 F.3d 197, 199 (3d

27

Cir. 2011) ("due process" includes "the right to a neutral arbiter").

Feldman and Akerman sought the views of Court personnel because of an on-going dispute about whether any escrow requirement was in effect while the Knopfs appealed the denial of their attachment motion. In providing her advisory opinion, Esposito's wife was "acting under color of state law," since she was "invoking the real or apparent power of" the First Department when she responded to Akerman's and Feldman's request. *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) ("An official acts under color of state law when [she] exercises a power . . . made possible only because [she] is cloaked with the authority of state law.")

Because "conspiracies are by their . . . nature secretive operations, the existence of a conspiracy . . . may . . . be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, *supra*.

Here, all elements of a §1983 conspiracy are well-pleaded.

**Point II**

**The Knopfs Were Injured by the *Ex Parte* Nature
of the Ruling by Esposito's Wife, Rather
Than Any First Department Orders**

**A. The First Department Orders Have Uniformly Ordered Sanford
to Deposit and Maintain Any Sale Proceeds in Escrow**

The District Court incorrectly concluded that the Knopfs were injured not by the Court attorney's advisory opinion, but instead by the actual First Department orders preceding it. SA17-18; *Knopf v. Esposito*, 2017 WL 6210851,*6 ("[T]he gravamen of the alleged harm stems not from any conspiracy but from orders duly issued in 2015 by the Appellate Division. * * * If the Knopfs were or are unhappy with orders issued by New York State courts, then [they had] ample avenues of redress through appeal or additional motion practice.")

The District Court's conclusion is refuted by the actual events.

On February 25, 2016, one day after the Knopfs learned of the sale but after approximately $2 million of the $3 million in proceeds had been dissipated, the Knopfs obtained a new escrow order from Justice Moskowitz, and Sanford paid $436,227.32 into escrow.

On March 24, the Appellate Division issued a preliminary injunction *freezing* the "proceeds derived from" the prior sale of 67th Street, *i.e.*, which

included those paid into the escrow ordered by Justice Moskowitz as well as the unused $365,849.05 balance of Dechert's $500,000 retainer. *Knopf v. Sanford*, *supra*, 137 A.D.3d at 663, 26 N.Y.S.3d at 866 (1ˢᵗ Dept. 2016). The $436,227.32 paid into the Moskowitz-ordered escrow remains frozen to this day, as does the remaining portion of the Dechert retainer. (The latter amount was reduced to $75,000 by Court order when the Knopfs settled claims against Dechert .)

Both versions of the June 16, 2016 order, besides rejecting the contempt application, also stated: "The underlying appeal has been decided (March 24, 2016) rendering moot plaintiffs' request for an injunction [transferring the Dechert retainer into escrow] pending appeal." (A226, A227.) This means what it says – given the March 24 injunction freezing the proceeds – including the balance of the Dechert retainer – there was no reason for an additional injunction transferring the Dechert retainer into escrow. *Cangro v. Rosado*, 2014 WL 658366, *3 (Sup. Ct., New York Co.) ("That portion of defendant's motion [seeking] an order enjoining plaintiff . . . is deemed moot, as such an injunction was granted by the Appellate Division . . . in its recent decision.")

In January 2017, Dechert moved to have the funds frozen by the March 24, 2016 decision released (A268), contending that "the June 16 Order denying the contempt motion necessarily meant that the Interim October [escrow order]

(Sweeny, J.) had earlier terminated and also operated as a matter of law to dissolve the Interim February Escrow Order (Moskowitz, J.)" (A281.) The Knopfs opposed the request, cited *Cangro*, *supra*, and pointed out that the June 16 decision found that the Knopfs' request for a transfer of the balance of the Dechert retainer into escrow moot because the March 24, 2016 injunction had already frozen those funds. (A750-A751.) The First Department denied Dechert's cross-motion in a decision dated May 9, 2017 (A270), indicating that it agreed with the Knopfs.

Thus, the Knopfs did successfully seek "redress through appeal or additional motion practice." However, because their attorneys were not on the call with Esposito's wife, they were not able to do so before $2.2 million was dissipated by Sanford.

## B. The Knopfs Were Harmed by the *Ex Parte* Nature of the Call, Rather than Any First Department Ruling

The District Court overlooked that the December 29, 2015 – whatever it has since been interpreted to  mean – served the Knopfs' purposes since Phillips, the buyer, was treating it as a prohibition against closing on escrow-free terms.  (A119, ¶44; A758, ¶7.)  The December 29 order did not state that the cross-motion was denied "as moot," or that Sanford and Phillips could close without escrowing the proceeds.  (A220.)  By denying the cross-motion to vacate the escrow requirement,

the December 29 order *seemed* to leave that requirement in place, especially since the First Department typically expressly states that interim relief is terminated, when it denies the underlying motion. (*See* A285-306.) Also, any notion that the intervening November 12 ruling was *intended* to terminate the October 22 escrow requirement – whatever its effect "by operation of law" – is refuted by the fact that Justice Moskowitz, who reinstated the escrow requirement on February 25, was the "Justice, Presiding" on the November 12 panel. (A217.) Internally, Sanford's lawyers viewed the December 29 ruling as keeping the escrow order in place. (A136, ¶85.)

Because Phillips cited the December 29 order as grounds not to close, Sanford correctly recognized that he needed clarification or declaratory relief. *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir.2005) (parties are entitled to declaratory relief when it " will serve a useful purpose in clarifying or settling the legal issues involved" and "offer relief from uncertainty."); *accord: Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 15, 65 S.Ct. 478, 482 (1945); *Arbor Realty Funding LLC v. East 51st St. Dev. Co., LLC,* 67 A.D.3d 559, 559, 890 N.Y.S.2d 14, 14-15 (1st Dept. 2009) ("plaintiff's [successful] motion for clarification of the February 2, 2009 order was essentially a motion to reargue that was granted (CPLR 2221[d][2])."); *accord: Grossberg v. Van Bakergem,* 2016

32

WL 283595, *2 (Sup. Ct., New York Co.)

Feldman's *pro se* memorandum *admits* that Sanford needed clarification: "Feldman decided that it was not for him to interpret the language of the TRO [*sic: escrow order*]. As such, no closing could be scheduled *until either the TRO [sic] was removed or the language clarified.*" (A481 (emphasis added).) Therefore Sanford needed to move for clarification on notice. "Such clarification may be 'obtained on motion. . . .'" *American ORT, Inc. v. ORT Israel,* 2009 WL 233950, *3 (S.D.N.Y.); CPLR 2221(a) ("A motion [relating to a prior order] . . . shall be made, on notice, . . .")

Any failure to serve a written motion for clarification, would have violated the Knopfs' right to due process. *Guenther v. Commissioner*, 889 F.2d 882, 889 (9th Cir. 1989) (IRS' *ex parte* submission of a trial memorandum violated taxpayer's right to notice and opportunity to be heard). The notice requirement applies with equal force to an oral request for clarification. *Browning v. Navarro*, *supra*, 826 F.2d at 345-346 (5th Cir. 1987) (§1983 conspiracy claim based on "private conferences" between plaintiff and the Court).

Even if the October 22, 2015 and December 29, 2015 orders did not turn out to be the impediments that Sanford, Phillips and Justice Moskowitz believed them to be, that would not retroactively excuse any failure to give notice of either a

written or an oral request for clarification. *Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs DOL,* 137 F.3d 799, 808 (4th Cir. 1998) ("If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of results.")

The Knopfs have suffered actual prejudice. *In re Motors Liquidation* Co., 829 F.3d 135, 162 (2d Cir. 2016), *cert den. sub nom. General Motors LLC v. Elliott,* __ U.S. __ , 137 S.Ct. 1813 (2017) arose out of federal efforts in 2009 to revive the U.S. auto industry. The appeal concerned a bankruptcy court's §363 "sale order" approving the transfer of certain "Old GM" assets to "New GM" free and clear of several categories of liabilities. After the sale was approved, New GM was forced to recall the 2005 Chevrolet Cobalt, and the issue was whether the free and clear sale order had properly extinguished Cobalt purchasers' product defect claims in light of the lack of notice to them. The bankruptcy court dismissed the due process arguments, holding that while the purchasers were entitled to actual notice of the proceeding, the lack of notice did not prejudice them since they had no legally valid objections. *In re Motors Liquidation Co.*, 529 B.R. 510, 557, 565-573 (Bankr., S.D.N.Y. 2015). Here, similarly, the District Court was unconcerned that the Knopfs were not given notice of, or an opportunity to participate in, the call with Esposito's wife, since it concluded that they had not been damaged by her

advisory ruling.

In *Motors Liquidation* this Court, reversing, held:

> [E]ven assuming plaintiffs must demonstrate prejudice, they have done so here. After examining the record as a whole, we cannot say with fair assurance that the outcome of the § 363 sale proceedings would have been the same had Old GM disclosed the ignition switch defect and these plaintiffs voiced their objections to the "free and clear" provision.

*Id.* at 163.

*Motors Liquidation* continued: "We cannot say with fair assurance that the outcome of the §363 sale proceedings would have been the same had Old GM disclosed the ignition switch defect and these plaintiffs voiced their objections to the 'free and clear' provision. Because we cannot say with any confidence that no accommodation would have been made for them in the Sale Order, we reverse."

Likewise, had the Knopfs been on the January 12 call with the Court attorney, they would have had the opportunity to immediately apply to an actual Appellate Division Justice for emergency relief, just like they did successfully after finding out about the property sale on February 24. They could have used this emergency application to press the argument that the denial of the motion to vacate the escrow order meant that it remained in place (since, *e.g.*, the First Department

typically terminates interim orders only *expressly*[9]).  More importantly, they would also have had the opportunity to request a new escrow order, just like the one they obtained from Justice Moskowitz on February 25.  Had they been able to obtain the emergency order on January 13 – prior to the February 1 sale to Phillips – the value of the assets frozen by the ensuing March 24 injunction would have been $3 million, rather than $800,000.

In *Motors Liquidation*, based on the possibility that the Cobalt purchasers might have succeeded in using the opportunity to object to obtain protection of their claims, this Court rejected the bankruptcy court's "conclu[sion] that it would [necessarily] have reached the same decision—that it would have entered the Sale Order on the same terms – even if plaintiffs had been given an opportunity to be heard[.]"  *Id.* at 163.  *Motors Liquidation* reasoned:

> [I]t is difficult to evaluate in hindsight what the objections would have been had plaintiffs participated in the § 363 sale. Perhaps they would have tried to identify some legal defect in the Sale Order, asked that economic losses or pre-closing accidents arising from the ignition switch defect be exempted from the "free and clear" provision, or requested greater priority in any GUC Trust distribution. . . . [Uncertainty about the content of plaintiffs' objections is the natural result of the lack of any meaningful opportunity to be heard in the § 363 sale proceedings.

*Id.* at 164.

---

[9]*See* A285-A306.

The Knopfs' showing of prejudice is far stronger here than that in *Motors Liquidation*. Here, hindsight confirms that the Knopfs *would have* obtained the necessary relief to preserve the value of their claim since, as set forth above, on each of the six occasions between October 22, 2015 and May 9, 2017 the First Department was asked whether prospective or existing sale proceeds should be released to Sanford or, instead, paid or maintained in escrow, it has chosen the latter. One can be "confident" that it would also have done so had the Knopfs been on the call on January 12, and made an emergency application on January 13.

*Motors Liquidation* is hardly an outlier, and it is irrelevant that the value of the Knopfs' claims was not entirely extinguished but only reduced as a result of the *ex parte* call. Robert M. Lawless, "Realigning the Theory and Practice of Notice in Bankruptcy Cases," 29 *Wake Forest Law Rev.* 1215, 1254 (1994) (notice is required to unsecured creditors: "[w]hen assets are transferred in satisfaction of an individual secured creditor's claim, the debtor's estate is diminished, leaving fewer assets to satisfy the claims of all other creditors."); *Mennonite Board Mennonite Board of Missions v. Adams*, 462 U.S. 791, 798, 103 S.Ct. 2706, 2711 (1983) (a party is entitled to notice of a proceeding which diminishes the value of his claim).

## C. Prejudice is Not Required to Establish a Due Process Violation

In *Liquidation Motors* this Court noted that it was uncertain whether a

procedural due process claim requires a showing of prejudice, contrasting holdings

of *In re New Concept House, Inc.*, 951 F.2d 932, 937 n.7 (8th Cir. 1991) ("a due

process violation cannot constitute harmless error") and *Perry v. Blum*, 629 F.3d 1,

17 (1st Cir. 2010) (prejudice required).

If uncertainty exists, there is not much. Neither this Court nor the Supreme

Court has ever required prejudice as an element of a procedural due process

violation. *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86-87,108 S.Ct. 896, 900

(1988) ("[I]t is no answer to say that in [a] particular case due process of law would

have led to the same result because [the party] had no adequate defense upon the

merits."); *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural

due process is 'absolute' in the sense that it does not depend upon the merits of a

claimant's substantive assertions."); *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir.

2002) (Sotomayor, J.) ("The question before us is the legality of the seizure, not the

strength of the Government's case[,]" citing *Fuentes v. Shevin*, 407 U.S. 67, 87, 92

S.Ct. 1983, [1997] (1972)("The right to be heard does not depend upon an advance

showing that one will surely prevail at the hearing."))

Therefore, even if the Knopfs' hadn't shown actual harm, their claim should

have been upheld since nominal and punitive damages would still be available.

*Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1066 (1978) (nominal damages

are available under §1983); *accord: Cummings v. Connell*, 402 F.3d 936, 942-43 (9th Cir. 2005); *McCardle v. Haddad*, 131 F.3d 43, 52-53 (2d Cir. 1997) (punitive damages "in a §1983 action")**.**

### Point III

### Both Direct and Circumstantial Evidence of a Conspiracy Are Adequately Alleged

**A. The District Court Decision Ignores What the Knopfs Alleged and Credits Defendants' Self-Serving Account**

The District Court repeatedly ignored the Knopfs' allegations, and based its rulings on defendants' – particularly Akerman's – factual assertions. For example, it states "As described in the FAC, Akerman requested to speak with a "clerk" and Akerman and Feldman "were transferred" to the Court attorney, who happened to be Esposito's wife ." SA18-19, 2017 WL 6210851,*7. The Decision further states:

> The *coincidence* that the Court attorney who responded to the Akerman and Feldman inquiry was also – unbeknownst to Akerman and Feldman – related to another attorney retained by Sanford to represent one of his companies is insufficient to state a claim of conspiracy with this state actor.

SA19, 2017 WL 6210851,*7.

The Court may have concluded that Akerman's call to the Court attorney was a "coincidence" based on Akerman's testimony that he "never spoke to the

39

Appellate Division about this [the clarification of the Order] prior to this particular call." A499:16-18. However, Akerman is flatly contradicted by Feldman, whose self-interest lies in supporting Akerman's version. Feldman testified that Akerman told him he had already been in communication with the Appellate Division: "[Akerman] called me and said *he was advised by the Appellate Division that the restraints were dissolved as a matter of law*, and I said, fine, and then when he knew I was on the phone, he called the Appellate Division, and we -- excuse me. And he asked for the clerk, and we got transferred once or twice, and we talked to this nice lady." A432:11-19.

Moreover, nowhere does the Amended Complaint allege that: "Akerman requested to speak with a 'clerk.'" This, again, was Akerman's account. Instead, the Knopfs allege:

> 12. * * * Akerman and Feldman *contacted Esposito's wife* in an *ex parte* phone call which took place on January 12, 2016. . . .
>
> 14(g). Also, on January 11, 2016, the same day Sanford promised to pay Esposito $55,000, he requested that Akerman contact the Appellate Division with Feldman on the line to obtain a clarification of the orders that aggrieved him.
>
> (h) According to Feldman, even before calling the First Department, Akerman knew that they would obtain a clarification that all restraints had been vacated as a matter of law.
>
> (i) When Akerman and Feldman called the Appellate Division, *they were immediately transferred to Esposito's wife. No coherent explanation for this circumstance had*

40

> been given. Then, as now, Esposito's wife was the head of
> the Court's Mediation Department, and thus had nothing to
> do with the First Department's Motions and Orders
> Division.

* * *

53. On January 11, 2016, the same day Sanford signed a $55,000 fee agreement with Esposito, he *instructed Akerman to contact the Appellate Division with Feldman on the call* to obtain a clarification of the December 29, 2015 order.

54. Akerman called Feldman on January 11 and again on the morning of January 12. During the second, January 12 call, Akerman indicated that he already knew that, when they contacted the Appellate Division, they would be told that the restraints had been "dissolved as a matter of law." Feldman further testified that Akerman then called the First Department with Feldman on the line and requested somebody by "position," and that they were transferred to Esposito's wife, the Court attorney, who then, as she is now, was employed in the Court's Mediation Part.

* * *

136. Akerman's knowing participation in the conspiracy to deprive the Knopfs of their protected property interest without notice and an opportunity to be heard (and his knowledge of the overall scheme) is established and can be in[ferred] from the events and circumstances described herein, including the following: * * *

> (c) *The fact that he called an attorney in the First
> Department's mediation department* to get an advisory
> ruling, behavior that would be inexplicable if he was not
> part of the conspiracy.

A105-A106, A109, A122, A152 (emphasis added).

The Amended Complaint does not allege that Akerman "called the clerk," or "the clerk's office" and was transferred randomly and coincidentally to Esposito's wife. It simply states what is known: (1) that Akerman and Feldman called the

Appellate Division and (2) that Akerman and Feldman spoke to Esposito's wife.  It then alleges the conclusion that Akerman "called an attorney in the mediation department" – *i.e.*, Esposito's wife  (A152, ¶136(c)) – even though the case had not been assigned to mediation and, therefore, that Akerman and Feldman "contacted Esposito's wife."  (A105, §12.) It further asserts that "no coherent explanation" exists for Akerman and Feldman speaking to an attorney in the mediation department in a case that had not been ordered to  mediation.  (A109, ¶14(i).)  It cites Feldman's testimony that Akerman knew in advance what the outcome of the call would be.  (A109, ¶14(h), A152, ¶136(b).)  It therefore alleges: "The fact that [Akerman] called an attorney in the First Department's mediation department [*i.e.*, Esposito's wife] to get an advisory ruling, [was] behavior that would be inexplicable if he was not part of the conspiracy."  A152, ¶136(c).

The District Court further discounted the allegation that "prior to calling the Appellate Division, Akerman indicated to Feldman that he 'already knew' that they would be told that the restraints had been dissolved as a matter of law," stating: "This . . . does not suggest Akerman's involvement in any conspiracy. The more natural inference is that Akerman had already studied the relevant state court orders and formed an independent judgment as to their effect." SA20, n.10, 2017 WL 6210851,*7 n.10.  These findings credit defendants' factual assertions, rather than

42

the Amended Complaint, which does *not* allege that Akerman and Feldman were ignorant of the Court's marriage to Esposito. That is defendants' assertion, within their exclusive knowledge and cannot be credited on a Rule 12(b)(6) motion. *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012). The District Court's finding that Akerman knew what the outcome of the call would be because he "had studied" the orders, also overlooks Akerman's admissions that he initiated the call to understand the "impact" of the orders on each other (A503:15-A504:28), didn't know that there had been two motion sequences (A504:16-23), and hadn't read Sanford's cross-motion to vacate the escrow order (A1183:12-16). It also discounts Feldman's testimony (A432:11-19) underlying the allegation.

## B.  The "Innocent Coincidence" Defense Does Not Support Dismissal

The District Court's theory of an innocent coincident is unrealistic, given the improbability that Akerman's call would be transferred to *any* Court attorney since Court attorneys at the First Department may not discuss rulings, or provide advice or interpretations. Also if a caller could actually persuade the Clerk's office to transfer his call concerning the interplay of three separate orders to a Court Attorney, the call would undoubtedly go to  one in Orders and Motions Department, not a mediator.

The alleged conspiracy is plausible based on the following *direct* evidence:

(a) The meeting between Sanford and Esposito at a restaurant in Oyster Bay on January 2 or January 3, 2016, at which time Sanford gave Esposito copies of the Appellate Division orders. (A120, ¶50.)

(b) A conversation between Esposito and his wife on approximately January 4, when she informed him that Sanford was not "aggrieved by" the orders, even though she hadn't seen one and didn't understand the other. (A718:3-A719:17.)

(c) A conversation between Sanford and Akerman on January 11, 2016, at which time Sanford provided Akerman with copies of the orders and directions to call the Appellate Division to have them clarified. (A122, ¶¶ 53, 133(c); A499:3-7.)

(d) Sanford's request that Feldman contact the Appellate Division to obtain "clarification," in order to avoid the possibility that Feldman's lawyer would herself seek clarification from the Court. (A643:18-A644:13.) Feldman responded to the request by volunteering to contact the Appellate Division. (A635:2-A636:8.) Sanford then decided to also have Akerman on the call as a "witness," which Akerman agreed to," after Sanford asked him to "get on the call." (A636:17-20.)

(e) An email from Akerman to Feldman setting up the call to the Appellate Division on January 12, 2016. (A655.)

(f) Akerman's statement to Feldman immediately before their joint ex parte call that when they called the Appellate Division they would be told that restraints had "dissolved as a matter of law" (A432:11-19.)

*Seven Seas Petroleum, Inc. v. CIBC World Markets, Corp.*, 2010 WL 2277489, *10

(S.D. Tex.) ("The allegation that CIBC was aware of the Directors' duties to the

Company and helped [them] conceal material information is more than an

44

allegation of parallel conduct. It is an allegation of concerted activity which necessarily implies an agreement. . . .")

The advance agreement is established by the ethical violations committed when Akerman and Feldman excluded the Knopfs' attorneys from the January 12 call placed to Esposito's wife. Rules of Professional Conduct, 22 NYCRR Part 1200, Rule 3.5(a)(2)(i)-(iii) (SA26) (prohibiting *ex parte* communication with "officials" and "employees" of "tribunals.") Obviously, the scheme would have backfired had Esposito's wife done what a neutral judicial officer would have done, and insisted that the Knopfs' attorneys be added to the call, and thereby alerted them that they needed to move immediately to enforce the escrow requirement. Areeda & Hovenkamp, *Antitrust Law*, vol. 4, ¶1425, p. 187 (4th ed.) ("If the actual defendants could not or would not have acted as they did without advance communication and understanding, then their action necessarily proves a traditional conspiracy.")

Parallel conduct occurred: Sanford's and Esposito's eliciting Esposito's wife's purported view that Sanford was not "aggrieved" by the orders and Akerman and Feldman calling her to hear her state that view a few days later. *Dubose v. Kelley*, 187 F.3d 999, 1003 (8th Cir. 1999) (allegations of a "mutual understanding" between the judge and private attorneys supported the conspiracy claim where the

attorneys and the judge engaged in specific *ex parte* communications that support an inference they agreed to "fix" the trial).

An attorney who is not even counsel of record on the pending appeal calling the First Department and raising a not-easily-explainable issue on the telephone and having that call actually go through to a Court attorney ready and willing to answer the question is unheard of. To have such a call randomly transferred to a Court attorney married to someone who could receive $55,000 depending on what she said during the call is beyond improbable. Since its citation in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.4, 127 S.Ct. 1955 n.4, 1965 (2007), ¶1425 of the Areeda *Antitrust Law* treatise, *supra*, entitled concerning "Unnatural Parallelism, Too Close for Coincidence," has attained scriptural status regarding when an illegal agreement can be inferred from parallel conduct. Here's how it characterizes claims of unlikely coincidence:

> [A]n inference of [advance communication] is easily made when the challenged action would simply not be possible without a traditional conspiracy. A good example would be identical secret bids on a made-to-order item unlike anything previously sold and not a mere assembly of common items with a standard price. To be sure, even that parallelism might result from mere coincidence, just as it is conceivable that an ape with a typewriter might produce a Shakespeare sonnet through mere chance. Nevertheless, the law does not insist on absolute certainty and rightfully disregards such low-order possibilities. A directed verdict of conspiracy is warranted against the hypothetical parallel bidders.

*Id.*, vol. 4, ¶1425, pp. 187-188; *Uthman v. Obama*, 637 F.3d 400, 406

(D.C.Cir.2011) ("Uthman's account . . . involves many coincidences that are

perhaps possible, but not likely.")

The far more likely explanation is that Sanford, Akerman and Feldman

agreed that Akerman and Feldman would call Esposito's wife precisely because

they knew in advance what she would say. *United States v. Pacchioli*, 718 F.3d

1294, 1303 (11th Cir. 2013) ("Indeed, that Pacchioli gave free goods and services

to all three facility managers would be a remarkable coincidence if not explained

by the plausible theory that he expected to win their favor. The jury could fairly

determine from this evidence that Pacchioli was guilty of conspir[acy] . . . and . . .

brib[ery].")  This is precisely what Feldman claims did happen:

> I did a file memo, and I gave a copy of it where [Akerman]
> called me *and said he was advised by the Appellate Division that the
> restraints were dissolved as a matter of law*, and I said, fine, and then
> when he knew I was on the phone, he called the Appellate Division[.]
> .

(A432:11-19.)

Even a plausible possibility of innocent coincidence does not justify a Rule

12(b)(6) dismissal. *In Re Broiler Chicken Antitrust Litigation*, 2017 WL 5574376,

*7 (N.D. Ill.) ("Although Defendants raise plausible alternative innocent

explanations for their conduct, it is improper at this stage of the proceedings to

weigh alternatives and which is more plausible.")

Even if an agreement between Sanford and Akerman that Akerman would call Esposito's wife precisely because they knew how she would "opine," were not the *more* likely explanation, it is still plausible, which is all that is required. *Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162, 184-185 (2d Cir. 2012) (upholding an alleged Sherman Act §1 conspiracy because: "A court . . . may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."); *accord: Gelboim v. Bank of America Corp.*, 823 F.3d 759, 782 (2d Cir. 2016); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321, 325 (2d Cir. 2010) (allegations "tending to exclude the possibility of independent action" are not required "at the pleading stage.")

To defeat a Rule 12(b)(6) motion, the complaint need only allege "a context that raises a suggestion of a preceding agreement not merely parallel conduct that could just as well be independent action[.]" *Id.* (quoting *Twombly*).

Parallel conduct will support an inference of a prior agreement if sufficient "plus factors" have been pled. Here, "plus factors" abound.

Conduct "consistent with or parallel to duties each person would perform in his or her position, does not tend to exclude independent action." *Hines v. Thomas,*

48

2016 WL 4492816, *10 (S.D. Ala.)  The corollary is also true:  conduct that violates a defendants' own duties can support an inference of an antecedent agreement; that is, attorney ethics violations are "plus factors," since they support an inference of improper motive. *Dubose*, *supra* ("An attorney . . . who participates in corrupt proceedings by continuing to practice in front of a judge who is known to have preordained an outcome in the attorney's favor serves only to compound the corruption."); *cf. Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) ("some of the material omissions from the search warrant affidavits were directly attributable to the appellants, which permits the inference of an improper motive for such conduct.")

Here, as noted, Akerman and Feldman violated Professional Conduct Rule 3.5(a)(2)(i)-(iii) when they did not include the Knopfs on the call.  While Akerman argued below that the call did not violate ethics rules because it did not relate to the merits, the argument is frivolous.  For more than a year the Knopfs and Sanford had waged a battle before the trial court and the First Department about whether the property could be sold and, if so, whether the proceeds had to be escrowed.  That was one of the two principal issues left in the case (the other being the amount of the Knopfs' damages), clearly part of the "merits."   Any contention that whether the sale proceeds had to be escrowed was a side issue is refuted Feldman's *pro se*

memorandum of law, where he acknowledged:

> *The last impediment was when the Appellate Division granted Plaintiffs temporary restraints ("TRO") pending Plaintiffs' application for a prelminary injunction*. The TRO [*sic:* escrow order] stated that the transfer of title could take place, but that "the proceeds had to be held in escrow pending further order of the Court." * * * [G]iven the litigious history of Plaintiffs . . . , *Feldman decided that it was not for him to interpret the language of the TRO. As such, no closing could be scheduled until either the TRO was removed or the language clarified.*

(A481.)

Akerman likewise admitted that he called about the merits of the dispute. A503:22-A54:6 (. . . I asked her, with respect to Exhibit 11 [the December 29 ruling], where the cross motion for vacatur of the Interim Order dated October 22, 2015 is denied, the question is -- let me try to think -- what impact that had on the interim relief, and she said none, because it was moot, that the Exhibit 55 [the November 12 ruling] basically superceded and was the further order of the Court, that basically nullified what was Exhibit 3 [the October 22 order]"); *see also*: A152, ¶136(j). These were intentional ethics violations. *In the Matter of Abbott*, 167 A.D.2d 617, 618, 63 N.Y.S.2d 848, 849 (3d Dept. 1990) (*ex parte* communications with Court "explaining default and inquiring about procedures for reopening it" were "in violation of the Code of Professional Responsibility. . . .")

A frequent "plus factor" is a "common motive" – usually financial – among

the defendants. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-254 (1987); *Gelboim*,

*supra*, 823 F.3d at 781-782 ("These allegations evince a common motive to

conspire – increased profits and the projection of financial soundness. . . ."); *Ross*

*v. American Express Co.*, 35 F.Supp.3d 407, 441 (S.D.N.Y. 2014) ("This plus

factor speaks to whether [the Television Defendants] also had a 'rational economic

motive' to adopt those clauses jointly, as opposed to going it alone.")   At the time

of the call, Sanford owed money to Dorsey and Feldman, and Akerman and

Feldman had independent motives to assist Sanford's pursuit of liquidity.  A132*,*

¶77 (Dorsey received "$11,000 for prior services" out of the proceeds of the sale

and Feldman received fees of $25,000 out of the proceeds of the sale); A350

(checks totaling $11,555.57 Dorsey received out of the proceeds of the closing);

A428:3-13 (Feldman's testimony he was paid for two years work out of the closing

proceeds.)

Another plus factor is  "communications among the defendants."  *Apex*,

*supra,* 822 F.2d at 254-255. Given the meetings within the nine days leading up to

the *ex parte* call, it is fair to infer that Esposito informed Sanford of how his wife

was willing to "opine," and that Sanford relayed the information to Akerman and

Feldman.  *D.K. by L.K. v. Teams*, 260 F.Supp.3d 334, 363 (S.D.N.Y. 2017)

("inter-defendant meetings or communications" . . . "might tend circumstantially to

evidence a . . . conspiracy.")

Any anomalous behavior may be a plus factor. *In re Text Messaging Antitrust Litigation*, 630 F.3d 622, 628-629 (7th Cir. 2010). Here, Sanford was represented on the pending appeal and the cross-motion to vacate the October 22 escrow order by Holwell, Shuster & Goldberg, LLC. (A588; A26.) Nevertheless, despite being counsel of record, Howell Schuster did not make the call. Instead, Akerman and Feldman made it, even though neither had appeared in the pending appeal, or even read the cross-motion at issue. (A1395, lines 12-20; A496, 65:11-19.) Eight to 13 plus factors for each defendant are alleged at A147, ¶133 - A154, ¶137.

## C. The Knopfs Adequately Allege that Esposito's Wife Joined the Conspiracy

The District Court incorrectly concluded: "There is no adequate pleading that Esposito's wife was a member of any conspiracy on January 12, 2016 when she answered a transferred call." SA19, 2017 WL 6210851, at *7 First, on January 3 or January 4, Esposito's wife stated that she would opine that Sanford was not "aggrieved" by either the October 22 or the December 29 order, even though she had not seen the former and didn't understand the latter. *See* p.13 & n.2, *supra*.

Her willingness to provide an interpretation that favored her husband's employer regarding orders she hadn't seen and didn't understand means that her advisory opinion did not stem from "chance, coincidence, [or] independent responses to common stimuli," but instead from "an advance understanding among the parties," to adopt Professor Areeda's terminology. *Areeda*, *Antitrust Law*, ¶ 1425a, p. 187.

An "advance understanding" is also evidenced by the Court attorney's conduct upon receiving the call. Akerman and Feldman identified themselves as Sanford's attorney at the outset of the call (A505:2-7; A508:20-24), and she was immediately aware that they were calling on behalf of a party who had recently retained her husband (A714:10-15). Akerman then informed her that they were calling about the same orders she had spoken with her husband about a few days earlier and, according to Feldman, she revealed that she already understood the issues. (A436: 10-11 ("I just know she was fully familiar with it"); A437: 11-13 ("She knew what was going on and she knew the order to which []he was referring to"); A650 ("She was familiar with the order and the action."); Esposito's wife herself admitted that she told Akerman and Feldman that she "was familiar with the orders" at issue. (A515:22-23.)

After Akerman and Feldman and identified themselves and describe the matter that concerned them, Esposito's wife proceeded without recusing herself or

directing that the Knopfs' attorneys be added to the call[10]  – before providing the advice that she knew Sanford wanted to hear and which could facilitate her husband receiv[ing] $55,000.

As Akerman testified, after he described the three orders to the Court attorney,  at least "a minute and a half" passed while the Court attorney was "silent." A502:3-21. Following this interlude, she provided her improper advisory ruling.  In  *Brucar v. Rubin,* 638 F.2d 987 (7th Cir.1980), the Seventh Circuit upheld a conspiracy claim where the agreement between the corrupt judge and his co-conspirator occurred  "just moments" before the improper ruling. *Id.* at 993.

### D.  There is No Requirement that Each Conspirator Enter an Agreement with Every Other

In the District Court, defendants incorrectly argued that the Knopfs were required to allege that each defendant had concluded an agreement with every other defendant.  The pleading requirements for a conspiracy to violate §1983 are

---

[10]She thus violated her own ethical obligations.  Advisory Committee on Judicial Ethics, Opinion 15-69 (SA26) ("Court attorney referees must obey the Rules Governing Judicial Conduct while performing their judicial duties and "so far as practical and appropriate" use the rules to guide their conduct (see 22 NYCRR 100.6[A]).* * * Thus, he/she may not preside in a case where his/her impartiality might be questioned, absent remittal of disqualification in proper circumstances (*see* 22 NYCRR 100.3[E][1]; 100.3[F]).)

identical to those for criminal conspiracy. *Pizzuto v. County of Nassau*, 239 F.Supp.2d 301, 309 (E.D.N.Y. 2003)   All that is required is that Sanford ("the hub") direct the activities of the other defendants ("the spokes")  and that "the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants[.]" *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971); *accord*:  *United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995); *United States v. Taggert*, 2010 WL 532530, *1 (S.D.N.Y.) ("the requisite 'rim" is established where 'each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants.'")

In a much discussed hub-and-spoke case, *United States v. Apple Inc.*, 952  F. Supp. 2d 638 (S.D.N.Y. 2013), Apple decided to enter the electronic book business. The business was dominated by Amazon, which sold about 90% of the ebooks of six major U.S. publishers. Apple persuaded five of these publishers to enter into agency agreements.  The agreements set prices, and the publishers raised their prices in cartel-like fashion.  Judge Cote found a hub-and-spoke price-fixing conspiracy (*id,* at 693-694), and this Court affirmed.  *United States v. Apple, Inc*., 791 F.3d 290, 313–14 (2d Cir. 2015).  Judge Cote's ruling was based on Apple – the hub – "herding" the these five publishers – the spokes –  and "nurturing" their

"collective action." *Id.* at 693. Here, Sanford (the hub) directly herded, nurtured

and set in motion the actions of Akerman and Feldman, two of the spokes.

Likewise, Sanford, through his intermediary, Esposito, herded and nurtured the

activity of Esposito's wife – a spoke – which resulted in her concerted activity with

Akerman and Feldman.

As previously detailed, there is also ample evidence of the "rim":

●On January 2 or January 3, Sanford and Esposito met, and negotiated fee arrangements and Sanford gave Esposito copies of at least the orders that concerned him.

●On or about January 4, Esposito gave the December 29 order to his wife, and she stated that she would opine that Sanford was not actually aggrieved by either it or the October 22 order, even though, as she later admitted, she didn't understand the former and hadn't seen the latter.

●That on January 11, Sanford entered into a contract to pay Esposito, $55,000. Sanford and Esposito agreed that Esposito wouldn't be paid until Sanford had achieved "liquidity." A120-121, ¶52.

●That on January 11, Sanford also gave the orders at issue to Akerman and asked him to call the Appellate Division with Feldman on the line. (A122, ¶¶53, 133(c); A499:3-7.) Sanford did this because he was concerned that Phillips' attorney might herself seek clarification and "screw it up." (A644:11-13.)

●That immediately before their call to Esposito's wife, Akerman called Feldman and stated that, when they called the Appellate Division, they would be told that the restraints on the property had been dissolved as a matter of law.

### E.  The Knopfs Have Satisfied this Court's
###     Standards for Pleading a Conspiracy

This Court's decisions confirm that sufficiency of Knopfs' conspiracy

allegations.  *McGee v. Doe*, 568 Fed.Appx. 32, 36 (2d Cir. 2014) upheld a

complaint which alleged:

> . . . that ADA Noah met with Dunn numerous times "in which,
> on information and belief, they attempted together to find facts that
> would 'square' with Galindo's statements to the police, and with the
> events surrounding the contract disputes the McGees were having with
> Dunn."  . . . Dunn provided Noah with various items of evidence, and
> that in his ten-month pursuit of this investigation and prosecution,
> Noah did not once interview Galindo.

Here, Esposito met with both Sanford and the Court attorney and "they

attempted together to find an interpretation" of the orders which would not impose

an impediment to the sale.  Sanford then "directed" Akerman and Feldman to

contact the Esposito's wife to present a description of the motions that would

"square" with the interpretation she had agreed to offer.  The Court attorney heard

what Akerman and Feldman had to say, was in constant contact with Esposito and

at no time sought out or heard the Knopfs' views. *See also:  United States v.

Zabare*, 871 F.2d 282, 288 (2d Cir. 1989)  ("based  the unusualness of the

circumstances surrounding Folch's contact with Zabare, and Richard Folch's

implicit representation to Zabare that he was but one of those invited to participate

in distributing the tickets, Judge Haight was amply justified in finding that Zabare knew, or had reason to be aware, that Folch was engaged in a scheme to sell blank Ticketron ticket").

## Point IV

### The Second Version of the June 16
### Order Is Irrelevant

Even apart from the irregularities described at pp. 20-23, *supra*, the *sua sponte* revision of June 16, 2016 order is invalid, and has no impact on this case. *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 n.2 (2d Cir. 1977) (court's "power to decide *sua sponte* whether its judgment should be vacated" exists only if parties ha[ve] notice[.]"); *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 352 (9th Cir. 1999) ("There is a problem because the correction came out of the blue, with no notice to Kingvision or opportunity to be heard on the reduction. A judgment is property, so taking it away requires due process of law."); *Myers v. Markey*, 74 A.D.3d 1344, 1345, 904 N.Y.S.2d 184, 186 (2d Dept. 2010) (revised order invalid "[S]ince no request was made to modify the prior order, the parties had no notice and were not afforded an opportunity to address the [need for] modification. . . .")

The second version also adopted the reasoning of Esposito's wife, as that

view was described in the Feldman's January 12 memo which Sanford submitted and the Court received on *in camera* basis. Since Sanford concealed from the Knopfs and the First Department the material information that the Court Attorney whose views he was relying on upon was married to his own employee, the Knopfs were denied a "full and fair opportunity to litigate" the motion, and the second version does not have preclusive effect. *Baker ex rel. Thomas v. General Motors Corp.*, 522 U.S. 222, 250, 118 S.Ct. 657, 672 (1989).

The statement in the second version of the June 16 order – "the TRO was vacated once plaintiffs' prior motion for a preliminary injunction was denied" – is neither binding on this Court nor correct. It is "pure conclusion of law." *Avon Development Enterpriser Corp. v. Samnick*, 286 A.D.2d 581, 582, 730 N.Y.S.2d 295, 297 (1ˢᵗ Dept. 2001). Since it is "not a decision of New York's highest court, [it] is therefore not binding on" a federal court, *Lehtinen v. Bill Communications, Inc.*, 1989 WL 129533, *1 (S.D.N.Y.). Instead, it is merely "a datum for ascertaining [the] state law" which a federal court may consider. *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 184 (1940).

The legal conclusion that the November 12 ruling terminated the escrow order is wrong as a matter of New York law. Procedurally, it could not terminate the October 22 escrow order, because that escrow order had been issued in

connection with a different motion (the October 22 motion) than the earlier July 24 motion which the November 12 ruling decided. James M. McGuire and Steven A. Engel, "Stay' for Awhile: CPLR 5519(c) Stay Applications in the First Department," *supra* ("If granted, the stay is an interim one in the sense that it remains in place *until* a full panel of the court decides the application and issues an order granting or denying the stay."); First Department Rule 600.2(a)(7) (party may apply for an interim stay pending the determination of a motion when he files the motion).

Unlike a TRO, a First Department interim order does not terminate automatically when the underlying motion is decided. Instead, the Appellate Division terminates interim orders only expressly, even when the underlying motion is denied. *J. Aron & Company v. Controladora Commercial Mexicana S.A.B.*, Index No. 603225/10, May 13, 2010 ("It is ordered that the motions are denied and the interim relief granted by the orders of a Justice of this Court dated April 22, 2010 is hereby vacated."); *Maria Cognata v. Next Management, LLC*, Index No. 603225/08, March 10, 2011 ("It is ordered that the motion is denied, *and the interim relief granted by an order of a Justice of this Court, dated February 2, 2011, is vacated*."); *Cabrini Terrace Joint Venture v. O'Brien*, Index No. 570255/08, July 6, 2010 (identical to *J.Aron* and *Maria Cognata*). (*See* A285-

60

A306, which includes *J. Aron*, *Maria Cognata*, *Cabrini*, *Cabrini* and 16 of the scores of other possible examples).

Thus, the First Department may determine the underlying motion simply by keeping the interim relief in place pending the appeal, as the December 29 ruling did in the view of Justice Moskowitz. *E.g., Deephaven Distressed Opportunities Trading, Ltd. v. 3V Capital Master Fund Ltd.*, Index No. 600610/08, October 18, 2011 (A307-A308).

Unlike a TRO, which by definition is prohibitory and therefore necessarily expires when the underlying motion for prohibitory preliminary injunction is denied, an escrow order is mandatory relief. *In re Feit & Drexler, Inc.*, 42 B.R. 355, 359 (Bankr., S.D.N.Y. 1984) (characterizing an order that money be escrowed as a "mandatory injunction"); *accord: In re Trafalgar Associates*, 53 B.R. 693, 696 (Bankr., S.D.N.Y. 1985). Thus, even when money damages are an adequate remedy, the New York Courts will freeze funds "held by the seller's lawyer as escrow funds under the contract of purchase[.]" *Bashein v. Landau*, 96 A.D.2d 479, 465 N.Y.S.2d 178, 179 (1st Dept. 1983); *Felix v. Brand Service Group, LLC*, 101 A.D.3d 1724, 1725, 957 N.Y.S.2d 545, 547 (4th Dept. 2012). They will therefore deny motions for preliminary injunction (or other provisional relief), and simultaneously enter, confirm or continue an escrow order. *Ferguson v. Fergus*

*Enterprises, Inc.*, 13 Misc.2d 235, 238-241, 175 N.Y.S.2d 974, 977-978 (Sup. Ct., New York Co. 1958); *Fieldstone Capital, Inc. v. Loeb Partners Realty*, 105 A.D.3d 559, 963 N.Y.S.2d 120 (1st Dept. 2013); *Glazer & Gottlieb v. Nachman*, 234 A.D.2d 105, 650 N.Y.S.2d 717 (1st Dept. 1996)

## **CONCLUSION**

For the foregoing reasons, this appeal should be granted, the Knopfs §1983 claim reinstated and the case randomly reassigned to another District Court judge.

Dated:  New York, New York
　　　February 20, 2017

Berry Law PLLC                                    /s/ Gary Greenberg
　　　/s/ Eric W. Berry                          Gary Greenberg, Esq.
By: _____                           666 Fifth Avenue, 27th Floor
　　Eric W. Berry                                New York, New York   10103
745 Fifth Avenue, 5th Floor                   (212) 765-5770
New York, New York  10151
(212) 355-0777

*Attorneys for plaintiffs-appellants Norma Knopf and Michael Knopf*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the foregoing brief is in 14-point proportionately-spaced Times New Roman type. According to the word processing system used to prepare this brief (WordPerfect X8 for Windows), the word count of the brief is 13762 not including the table of contents, table of authorities, certificate of service and this certificate of compliance.

/s/ Eric W. Berry

_____

Eric W. Berry