# 17-4151,18-668(L)&18-2193(con.)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

▶▶ ◀◀

NORMA KNOPF and MICHAEL KNOPF,

*Plaintiffs-Appellants,*

*against*                                                   Dkt No. 17-4151

FRANK ESPOSITO, DORSEY & WHITNEY, LLP, NATHANIEL H. AKERMAN, EDWARD S. FELDMAN and MICHAEL HAYDEN SANFORD,

*Defendants-Appellees,*

---

NORMA KNOPF and MICHAEL KNOPF,

*Plaintiffs-Appellants,*

ERIC W. BERRY, ESQ.

*Appellant,*                           Dkt Nos. 18-668(L), 18-2193(con)

*against*

FRANK ESPOSITO, DORSEY & WHITNEY, LLP, NATHANIEL H. AKERMAN, EDWARD S. FELDMAN and MICHAEL HAYDEN SANFORD,

*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the Southern District of New York*

## APPELLANTS' BRIEF

Eric W. Berry
c/o Berry Law PLLC
*Attorney for Plaintiffs-Appellants*
  *Michael and Norma Knopf*
  *and Appellant Pro Se*
745 Fifth Avenue, 5th Floor
New York, New York 10151
(212) 355-0777
berrylawpllc@gmail.com

Gary Greenberg, Esq.
*Attorney for Plaintiffs-Appellants*
  *Michael and Norma Knopf*
666 Fifth Avenue, 27th Floor
New York, NY 10103
(212) 765-5770
gg@ggreenberglaw.com

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................. (v)

Jurisdictional Statement............................................................ 1

Statement of the Issues............................................................. 1

Statement Pursuant to Local Rule 28.1........................................ 2

Introduction............................................................................ 3

Statement of the Case............................................................... 10

    I.  Statement of Facts...................................................... 10

        A.  The Knopfs' Breach of Contract Action
        against Sanford and Pursuit................................ 11

        B.  Justice Sweeney's
        October 22, 2015 Escrow Order........................... 13

        C.  Sanford's Unsuccessful Cross-Motion to
        Vacate the Escrow Order..................................... 14

        D.  Phillips' Refusal to Close, as A
        Result of the December 29 Ruling......................... 15

        E.  Defendants' Collusion with Ringel to Avoid
        the Apparent Escrow Requirement......................... 17

            1.  Sanford's Enlisting Esposito and
            Ringel in His Scheme.................................. 17

            2.   Akerman's Call to Ringel's
            Unpublished Number at the First
            Department and Ringel's Ex Parte Opinion............. 18

3.  The Decision to Distribute the Proceeds Based
On Ringel's Ex Parte Advisory Opinion.................. 20

4.   Ringel's Recruiting McGuire and
Dechert on Sanford's Behalf.................................... 21

5.  The Closing and the Payments to Esposito,
Dorsey, Feldman, Sanford and Dechert.................... 21

6.  JHO Gammerman's
Report on the Knopfs' Damages.............................. 22

7. The Knopfs' Successful Motion to
Enforce the Escrow Requirement............................. 22

8.  The Appellate Division's Injunction.................... 24

9.   The In Camera Submission of the
Feldman/Akerman Memos........................................ 25

10.  The June 16, 2016 Orders.................................. 25

II.    Proceedings Before the District Court and OCA.................. 28

Standard of Review.................................................................. 31

Summary of Argument............................................................ 31

Argument............................................................................... 36

Point I
The Knopfs Adequately Allege A Conspiracy
Among Defendants to Deprive Them of
their Right to Due Process of Law............................... 36

**<u>Table of Contents (con'd)</u>**

A.    The Knopfs Were Deprived of  the Rights to
Notice and Opportunity to Be
Heard and to a Neutral Decision-Maker............................    36

B.  The Knopfs Adequately Allege A
Conspiracy to Violate §1983..............................................    40

    1.  A State Actor Participated in the Scheme...........    40

    2.  Akerman's Possession of  Ringel's
Unpublished Number Is Evidence of a
Hub and Spoke Conspiracy......................................    40

    3.  The Ethical Violations by Akerman,
Feldman and Ringel Support the
Conspiracy Allegations...........................................    42

    4.   The Identical Incorrect Accounts Provided
By Akerman, Feldman and Ringel
Support the Conspiracy Claim.................................    45

    5.   Dorsey's Refusal to Review the
Akerman's Emails With Sanford
Supports the Conspiracy Claim...............................    46

C.  Ringel's Approval of an Escrow
Free Sale Was State Action................................................    47

D.   The Knopfs Also State A
Substantive Due Process Claim..........................................    48

Point II
Under Motors  Liquidation, and the Mathews v. Eldridge
Balancing Approach, The Knopfs Have
Adequately Alleged Prejudice.......................................................    48

A.   The District Court's Hindsight Analysis of
the Knopfs' Prejudice Allegation Was Improper.............. 50

B.   The Entire Record Establishes that the Knopfs'
Would Have Avoided Their Loss Had they
Been Included in Akerman's Call to Ringel...................... 55

Point III

The the Amended June 16, 2016 Order Cannot Preclude the
Knopfs' Due Process Claims, Since it Was
Issued Sua Sponte Without Affording the
Parties a Chance to Oppose the Revision...................................... 60

Point IV

The Knopfs Claims for Nominal and Punitive Damages
Are Not Dependent on a Showing of Prejudice........................... 62

Point V

The Sanctions and Fees Awards Should be Vacated.................... 63

Conclusion............................................................................................. 66

Certificate of Compliance...................................................................... 66

# TABLE OF AUTHORITIES

**Case**                                                      **Page(s)**

*In re 60 E. 80th St. Equities, Inc.*
218 F.3d 109 (2d Cir. 2000)..........................................    31

*Adickes v. S.H. Kress and Co.*
398 U.S. 144 (1970)..................................................    8, 40, 47

*Arbor Realty Funding LLC v. East 51st St. Dev. Co., LLC*
890 N.Y.S.2d 14 (1st Dept. 2009)..................................    17

*Ashley v. Jones*, 2005 WL 2043647 (Tenn. App.).......................    52

*Bashein v. Landau* 465 N.Y.S.2d 178 (1st Dept. 1983)................    16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..................    31

*Bogdan ex rel. Parra v. Marsh USA, Inc.*
319 F.Supp.3d 633 (S.D.N.Y. 2018).............................    52-55

*Cangro v. Rosado*,
2014 WL 658366 (Sup. Ct., New York Co., Feb.1, 2014)...........    58

*Carey v. Piphus*, 435 U.S. 247 (1978)...........................    62

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)..............    9-10

*Cine SK8, Inc. v. Town of Henrietta*
507 F.3d 778 (2d Cir. 2007)...........................................    47

*In re Currency Conversion Fee Antitrust Litig.*
773 F.Supp.2d 351 (S.D.N.Y.2011).............................    44-45

*In re Dinova*, 212 B.R. 437 (B.A.P. 2d Cir. 1997).....................    9, 39

*Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*
465 F.3d 33 (1st Cir. 2006)...........................................    60- 61

**Table of Authorities (con'd)**
**Case**                                                                   **Page(s)**

*Dubose v. Kelley*, 187 F.3d 999 (8th Cir. 1999)............................ 45

*Ecotone Farm LLC v. Ward*
639 Fed.Appx. 118 (3d Cir. 2016)................................................. 47-48

*Farrar v. Hobby*, 506 U.S. 103 (1992)......................................... 62

*Federal Deposit Ins. Corp. v. Five Star Mgmt., Inc.*
692 N.Y.S.2d 69 (1st Dept.1999)................................................... 221n.4

*Ferguson v. Fergus Enterprises, Inc.*
175 N.Y.S.2d 974 (Sup. Ct., New York Co. 1958)...................... 16-17

*Fieldstone Capital, Inc. v. Loeb Partners Realty*
963 N.Y.S.2d 120 (1st Dept. 2013)................................................ 16

*Gelboim v. Bank of America*, 823 F.3d 759 (2d Cir. 2016).......... 44

*Giusto v. City of San Mateo* 2006 WL 805072
(Super. Ct., Calif., San Mateo Co., Mar.30, 2016)....................... 52

*Goodyear Tire & Rubber Co. v. Haeger*
137 S.Ct. 1178 (2017).................................................................... 66

*Hanrahan v. Doling*, 331 F.3d 93 (2d Cir. 2003)........................ 32, 51

*Hayes v. Koch Entertainment, L.P.*
292 Fed.Appx. 389 (5th Cir. 2008)................................................ 61

*Hill v. Clarke*, 2012 WL 13018385 ( N.D. Ga., Aug.16, 2016)..... 63

*Hines v. City of Albany*, 862 F.3d 215 (2d Cir. 2017)................. 31

*In re Insurance Brokerage Antitrust Litig.*
618 F.3d 300 (3d Cir.2010)........................................................... 41, 44-45

**Table of Authorities (con'd)**
**Case**          **Page(s)**

*In re Interest Rate Swaps Antitrust Litig.*
261 F.Supp.3d 430 (S.D.N.Y.).......................................    44

*International Controls Corp. v. Vesco*
556 F.2d 665 (2d Cir. 1977)...........................................    61

*Lipson v. Snyder*, 701 F.Supp. 541 (E.D. Pa. 1988).....................    48

*Jensen v. Phillips Screw Co.*, 546 F.3d 59 (1st Cir. 2008)............    63-64

*Johns-Manville Corp. v.Chubb Indemnity Ins. Co.*
600 F.3d 135 (2d Cir. 2010)...........................................    32, 55, 61-62

*Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*
168 F.3d 347 (9th Cir. 1999)...........................................    60

*Knopf v. Esposito,* 2017 WL 6210851 (S.D.N.Y. Dec.7, 2017)....    3

*Knopf v. Esposito,* 2018 WL 1226023 (S.D.N.Y, Mar.5, 2018)....    3, 57

*Knopf v. Esposito*, 2018 WL 3579104 (S.D.N.Y., Jul.25, 2018)...    3

*Knopf v. Phillips*, 2018 WL 4080347 (S.D.N.Y., Aug.27, 2018)....    64

*Knopf v. Sanford*, 1 N.Y.S.3d 18 (1st Dept. 2014).......................    12

*Knopf v. Sanford*, 26 N.Y.S.3d 866 (1st Dept. 2016)....................    11, 24, 57

*Knopf v. Sanford*, 55 N.Y.S.3d 214 (1st Dept. 2017)....................    22n.5

*Knopf v. Sanford*,
2018 WL 1769299 (Sup. Ct., New York Co., Feb.9, 2018).........    22

*Knopf v. Sanford*
2019 WL 429469 (Sup. Ct., New York Co., Feb.4, 2019)...........    7, 16, 57

**Table of Authorities (con'd)**
**Case**                                                     **Page(s)**

*Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002)........................... 38, 62

*Lane Hollow Coal Co. v. Dir., Office of Workers'*
*Comp. Programs DOL* 137 F.3d 799 (4th Cir. 1998)....................    37, 38

*Latin America Finance Group, Inc. v. Pareja*
2007 WL 1009506 (S.D.N.Y., Apr.2, 2007)................................    63

*LeBlanc-Sternberg v. Fletcher,* 143 F.3d 765 (2d Cir. 1998).......    63

*Lipson v. Snyder*, 701 F.Supp. 541 (E.D.Pa. 1988).....................    48

*Logan v. Zimmerman Brush*, 455 U.S. 422 (1985)......................    60

*Lugar v. Edmondson Oil Co.*
457 U.S. 922  (1982).....................................................    40

*M&B Joint Venture, Inc. v. Laurus Master Fund, Ltd.*
879 N.Y.S.2d 812 (2009)..............................................    21n.3

*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893 (1976)............    48, 51-52

*Mennonite Board of Missions v. Adams*
462 U.S. 791 (1983).....................................................    36

*In re Motors Liquidation Co.*
529 B.R. 510 (Bankr., S.D.N.Y. 2015).......................................    49

*In re Motors Liquidation Co.*, 829 F.3d 135, 162 (2d Cir. 2016)
*cert den. sub nom. General Motors LLC v. Elliott*
137 S.Ct. 1813 (2017)..................................................    *passim*

*National Council of Resistance of Iran*
251 F.3d 192 (D.C. Cir. 2001).....................................    36

**Table of Authorities (con'd)**
**Case**                                                                 **Page(s)**

*Nicosia v. Amazon.com, Inc.,* 834 F.3d 220 (2d Cir. 2016)...........   31

*Owens v. Treder*, 873 F.2d 604 (2d Cir. 1989)............................   59-60

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir.1999)....................   40

*Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002)..............   45

*People v. Burts*, 571 N.Y.S.2d 418 (Ct. App. 1991).....................   50n.13

*Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80 (1988)................   62

*Rescuecom Corp. v. Google, Inc.*
562 F.3d 123 (2d Cir. 2008)..........................................................   31

*Rodrigues v. City of New York*
602 N.Y.S.2d 337 (1st Dept. 1993)...............................................   61

*Sablosky v. Sablosky,* 784 A.2d 890 (Conn. 2001).......................   17

*Seven Seas Petroleum, Inc. v. CIBC World Markets, Corp.*
2010 WL 2277489 (S.D. Tex., Jun.4, 2010)................................   43

*Six v. Generations Federal Credit Union*
891 F.3d 508 (4th Cir. 2018)..........................................................   65

*Smith v. Wade*, 461 U.S. 30 (1983)..............................................   62

*Tierney v. Vale*, 304 F.3d 734 (7th Cir. 2002)...............................   47

*Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)...................   53-55

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014)...............   41, 46

**Table of Authorities (con'd)**
**Case**                                                                 **Page(s)**

*United States v. Apple, Inc.*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013),
*aff'd* 791 F.3d 290 (2d Cir. 2015)...................................................   42

*United States v. City of New York*
359 F.3d 83 (2d Cir.2004).............................................................   31, 62

*United States v. Eltayib*, 88 F.3d 157, 170 (2d Cir. 1996)............   46

*United States v. Estrada*, 441 F.2d 873 (9th Cir. 1971)................   41

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995)...............   42

*United States v. Muse*
2007 WL 1989313 (S.D.N.Y., Jul.3, 2007)..................................   64

*Victory v. Pataki*, 814 F.3d 47 (2d Cir. 2016)..............................   39, 43

*Ward v. Village of Monroeville*
409 U.S. 57, 93 S.Ct. 80 (1972).....................................................   39

*West v. Atkins*, 487 U.S. 42 (1982).............................................   47

*Wheat v. United States*, 486 U.S. 153 (1988).............................   45

*Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016).......................   40

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000)............................   32

*Zelmer v. Constantine*
2015 WL 417994 (W.D. Wash., Jan.30, 2015)............................   44-46

## Table of Authorities (con'd)

**Page(s)**

### United States Code

11 U.S.C. §363.................................................................... 48, 49

28 U.S.C. §1291.................................................................. 1

28 U.S.C. §1331.................................................................. 1

28 U.S.C. §1367.................................................................. 3

28 U.S.C. §1927.................................................................. 2, 31, 63-65

28 U.S.C. §1988.................................................................. 2, 31, 62, 63-65

42 U.S.C. §1983.................................................................. *passim*

### Federal Rules of Civil Procedure

Fed. R. Civ. P. 11............................................................... 63

Fed. R. Civ. P. 12(b)(6)...................................................... 3, 31

Fed. R. Civ. P. 15(a)(2)....................................................... 3

Fed. R. Civ. P. 60(b)........................................................... 3

### Civil Practices Laws and Rules

CPLR 2221........................................................................ 17

**Table of Authorities (con'd)**

Page(s)

**New York Code of Rules and Regulations**

Rules of Professional Conduct, 22 NYCRR Part 1200
Section 1.0(w)................................................................... 8, 33n.11, 47

Section 3.5(a)(2).............................................................. 39

Section 3.5 [comment 2].................................................. 33

**Ethics Standards**

ABA, *Model Rules of Professional Conduct:*
*Preamble & Scope* (August 15, 2018).......................... 45

ABA, *Ethical Consideration* 7-35................................. 39

NYSBA, *Ethics Opinion* No. 420................................. 39

N.Y.S. Advisory Committee on Judicial Ethics, Opinion 15-69.... 39

**Treatises and Articles**

AREEDA & HOVENKAMP, ANTITRUST LAW:
AN ANALYSIS OF ANTITRUST PRINCIPLES AND
THEIR APPLICATION, vol. IV, §1425a........................... 43

David B. Saxe, "How We Operate at the Appellate
Division, First Department: An Insider's View,"
*New York Law Journal*, July 22, 2016.......................... 23n.6, 26

Jack Newsham, "NY Court Atty Resigns After Giving
Advice To Hubby's Client." *Law360.com*..................... 30n.10

# JURISDICTIONAL STATEMENT

Federal subject matter jurisdiction exists under 28 U.S.C. §1331 since plaintiffs-appellants Norma and Michael Knopf allege a violation of the Civil Rights Act of 1871, 42 U.S.C. §1983. (SA73).

Appellate jurisdiction over a final decision lies under 28 U.S.C. §1291.

Notices of appeal from a Clerk's Judgment entered on December 13, 2017, a "Final Judgment" entered on March 8, 2018 and a post-judgment Opinion and Order dated July 25, 2018 were filed on December 22, 2017 (SA24), March 8, 2018 (SA51) and July 25, 2018 (SA71). This Court ordered "a single brief and appendix addressing all three appeals. . . [.]" Dkt. 17-4151, Doc. 99.[1]

# STATEMENT OF THE ISSUES

(1) Whether failure to give an adversary notice of an oral application for declaratory-type relief violates the due process requirement of notice and opportunity to be heard.

The District Court answered this question in the negative.

(2) Whether a conspiracy is adequately pleaded if the events alleged would likely not have occurred but for an antecedent agreement among the defendants.

The District Court impliedly answered this question in the negative.

---

[1] The Court ordered these appeals to be argued in tandem with *Knopf v. Phillips*, Dkt. 18-668 ("*Phillips* appeal").

(3)  Whether a claim of prejudice stemming from a due process violation is determined from the vantage of hindsight, or based on the circumstances known at the time of the violation.

The District Court held that the determination is made from the vantage of hindsight.

(4) Whether prejudice must be shown to establish a procedural due process claim.

The District Court did not address the question.

(5)  Whether filing a single action, as opposed to multiplying or delaying proceedings, may be sanctioned under 28 U.S.C. §1927.

The District Court answered this question in the affirmative.

(6) Whether sanctions under 28 U.S.C. §1927 and fees under 28 U.S.C. §1988 may be assessed for punitive rather than compensatory purposes.

The District Court answered this question in the affirmative.

# STATEMENT PURSUANT TO LOCAL RULE 28.1

Appeal 17-4151 is from the Clerk's Judgment entered on December 13, 2017 (SA22-SA23) and brings up for review an Opinion and Order, dated December 7, 2017 (SA1-SA21), that dismissed the Knopfs' §1983 claim with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), and their state law claims without prejudice under 28 U.S.C. §1367(c)(3). This appeal does not challenge the latter ruling. The opinion is available at 2017 WL 6210851.

Appeals 18-668(L) and 18-2193(con.) are from a "Final Judgment" filed on March 8, 2018 (SA48-SA50) and an Opinion and Order (SA53-SA70), filed on July 25, 2018. They bring up for review a March 5, 2018 Opinion and Order (SA25-SA47) imposing sanctions and attorneys fees against the Knopfs and their attorney, Eric Berry. They also bring up for review the rulings in the July 25 decision (SA53-SA70) that: (a) denied the Knopfs' motion pursuant to Fed. R. Civ. P. 60(b) to vacate the dismissal of the action and the award of fees and sanctions (but reduced that award); and (b) denied their motion pursuant to Rule 15(a)(2) for leave to file a Second Amended Complaint. The March 5 and July 25 opinions are available at 2018 WL 1226023 and 2018 WL 3579104, respectively.

## INTRODUCTION

This case is about defendants' corruption of a judicial officer, Melissa Ringel, the wife of defendant Frank Esposito. Ringel was a Court Attorney in the New York State Appellate Division, First Department. She resigned because of the events at issue here.

In 2014, plaintiffs Norma and Michael Knopf obtained summary judgment on loan agreements against their borrower, Pursuit Holdings, LLC, a company owned by defendant Michael Sanford.  The summary judgment decision did not determine damages. In 2015, while the Knopfs were awaiting a hearing on the amount owed to them, they learned that Pursuit had contracted to sell a penthouse on 67th Street that it had purchased with one of the loans from the Knopfs. The Knopfs moved for a prejudgment attachment, which the trial court (Braun, JSC) denied.

The Knopfs appealed the denial of the attachment motion. After perfecting the appeal, they obtained two orders from the First Department that were intended to protect their interest in the 67th Street apartment while that appeal was being decided.

The first order, dated October 22, 2015, provided that if Pursuit sold the apartment the proceeds had to be paid into escrow. (A224-225.)  The second, dated

December 29, 2015 (A229), denied a cross-motion by Sanford and Pursuit to

vacate the October 22 escrow requirement. Citing these orders, Pursuit's in-

contract buyer, Michael Phillips, refused to close unless the proceeds were

escrowed.

A March 26, 2018 report by the New York State Office of Court

Administration ("OCA") (A1705-1769) establishes that:

> ●In early January 2016 Sanford and defendant Frank Esposito
> met, and Sanford gave Esposito the December 29 order.  Esposito
> shared it with his wife,  Ringel, then employed in the First
> Department. Ringel informed Esposito that she would opine that
> neither the October 22 escrow order nor the December 29 ruling
> which upheld the escrow requirement was an obstacle to an escrow
> free sale. (A727:21-728:9). However, she later testified that she was
> never given the October 22 order (A1896:7-16), and did not
> understand the one from December 29  (A735:6-16).

> ●On January 11, 2016, Sanford and Esposito agreed in writing
> that Sanford would pay Esposito a $55,000 one-time fee for
> unspecified services. (A1711 n.9, A212-213.)  They also agreed that
> Esposito would not be paid until Sanford became "liquid." (A1711
> n.9; A1354:7-17; A570-A571, ¶6.)

> ●On January 12, 2016, at Sanford's request, defendant
> Nathaniel Akerman, a lawyer at defendant Dorsey & Whitney, LLP,
> called Ringel on her *unpublished* direct number at the First
> Department. (A1715-1716.) Akerman did not notify the Knopfs'
> attorneys that he intended to make the call, or give them an
> opportunity to participate in it.  Before calling Ringel, Akerman
> patched in Sanford's real estate attorney, defendant Edward Feldman.
> (A1772-1773, ¶6.) Despite not having seen the October 22 order, and
> by her own admission, not understanding the December 29 order,
> Ringel advised Akerman and Feldman that the apartment could be

sold without escrowing the proceeds. (A1938:10-1939:3; A660:17-661:5; A768, ¶9(C).)

●Ringel's January 12, 2016 advisory opinion was used to convince Phillips to close on escrow free terms. (A491; A742:7-A743:10.) None of the $3 million in sale proceeds were escrowed, and none went to the Knopfs. $164,500 was paid to Esposito. (A2200-2204.) Dorsey, Feldman and Sanford also received payments from the proceeds. $500,000 was used to pay Dechert, LLP an initial retainer, after Ringel recruited Dechert attorney James McGuire, for whom she had clerked when he was a First Department Justice, to appear as Sanford's new counsel. (A1712; A46-A47, ¶70.)

On February 25, 2016, one day after the Knopfs learned of the sale, they successfully enforced the escrow requirement, obtaining a new escrow order from Appellate Division Justice Karla Moskowitz, but only after all but $436,227.32 of the proceeds was dissipated. On March 24, 2016, the Knopfs prevailed on the appeal when the First Department ordered a freeze of Pursuit's assets, including the $436,227.32 paid into the Moskowitz-ordered escrow and Pursuit's fee interest in the remaining properties. However, these orders came too late to prevent the loss of $2.2 million out of the funds distributed (rather than escrowed) based on the *ex parte* opinion Ringel provided Akerman.

In a related case, Akerman and Feldman testified that they spoke to Ringel only because they called a general number at the First Department clerk's office, and then were randomly and coincidentally transferred to her. (A1974-1975; A441:17-19.) Defendants submitted that testimony in support of their motions for

6

dismissal and sanctions in this case, both of which the District Court granted, crediting the claim of a transferred call.

Following the dismissal and sanctions order, OCA filed its report, which appended First Department phone records. Those records showed that on January 12, 2016 Akerman called Ringel three times on her *unpublished* direct number, and did not call the Clerk's general number at all. (A1715-1716, A1759-A1762.) As the report noted, those records "belie the . . . deposition testimony of both Mr. Akerman and Mr. Feldman." (A1769.)

Following the OCA report, the District Court again held that defendants were innocent of any due process violation, concluding that the Knopfs did not "have a right to participate in the January 12, 2016 telephone call." (SA63). The outcome is necessarily wrong since it presumes that due process permits a party to be excluded from the application for governmental intervention that causes its loss. The District Court's view diverges from the state court's. As Justice Gerald Lebovits, the trial court Justice assigned to *Knopf v. Sanford*, recently held: "The court attorney's opinion enabled Sanford to close on the sale. Without their placement into escrow, the sale funds went unprotected from disbursement, and the Knopfs lost a $3 million asset on which to collect a judgment." *Knopf v. Sanford*, 2019 WL 429469, *5-6 (Sup. Ct. New York Co., February 4, 2019). Ringel's

"opinion" was contrary to that of the actual Justices on the First Department. On six separate occasions – two prior to the Akerman-Ringel call and four afterwards – that Court heard an application by Sanford to permit the proceeds (or remaining proceeds) of the sale to be distributed rather than escrowed. Each time the actual Justices turned him down.

The District Court itself recognizes evidence that Ringel's so-called opinion was rigged, acknowledging:

> The OCA Report . . . discloses that Esposito and his wife had discussed the State Court Action before she received the January 12, 2016 telephone call, that she violated state court procedures in responding to the questions posed by [Akerman and Feldman] in that call, and that she did not promptly disclose the call to anyone in the Appellate Division, as she should have done.

SA68-69. Ringel conceded that her opinion was encouraged by Esposito. A1895:5-9 ("I don't know that I told him, he told me and I agreed.")

Ringel's advisory opinion is "state action" under federal case law, *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 152 (1970) and "adjudicative" action under New York's *Rules of Professional Conduct*, 22 NYCRR 1200, §1.0(w), definitions that turn on the nature of the conduct, rather than the official's assigned responsibilities. Ringel's opinion, suggested by Esposito, was purchased, and the price paid from the proceeds of the sale that it facilitated. It was obtained in violation of the Knopfs' right to be heard on the call and by lawyers who

intentionally contacted Sanford's self-selected decision-maker, knowing in advance what she would tell them. As Feldman testified: "[Akerman] called me and said he was advised by the Appellate Division that the restraints were dissolved as a matter of law, and I said, fine, and then when he knew I was on the phone, he called the Appellate Division. . . ." (A657:11-17.)

Defendants used Ringel's "advisory opinion" – not an actual order of an actual judge – to convince Phillips that the proceeds could be distributed. As Feldman stated in the District Court: "This conference call [with Ringel] lasted but a few minutes. Then, *based upon this call*, the closing took place and the proceeds were distributed." *Id.* This strategy was chosen specifically, as Feldman admits, to defeat the Knopfs' judicial "efforts to stop the sale." (A490).

What happened violated fundamental premises underlying the adversary system. *In re Dinova*, 212 B.R. 437, 445 (B.A.P., 2d Cir. 1997) ("[T]he American judicial system is predicated on the adversary process and forbids *ex parte* communications on substantive matters by statute, rule and code of ethics.") The agreement to pay Ringel's husband in exchange for her advisory opinion is not dissimilar from conduct that led this Court to refuse to enforce the Ecuadoran judgment in *Chevron Corp. v. Donziger*, 833 F.3d 74, 117 (2d Cir. 2016) ("promis[ing] $500,000 to the [then-presiding] Ecuadoran judge" in exchange for

his agreement "to rule in the [Ecuadoran plaintiffs'] favor and sign their judgment")

*In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *cert. den. sub nom. General Motors LLC v. Elliott*, 137 S.Ct. 1813 (2017) holds that a due process violation causes actionable prejudice if, based on the "probable effect of the error," the reviewing court cannot "be confident in the reliability of prior proceedings when there has been a procedural defect[.]" 829 F.3d at 162-163.

The Knopfs' loss is not merely a probable but a certain effect of the procedural defect (their exclusion from Akerman's call to Ringel). Had the Knopfs' attorneys been on the call, they would have collected the full $3 million value of the property. That is known because on February 25, 2016, one day after the Knopfs learned of the sale, they successfully enforced the escrow requirement, obtaining a new escrow order from Justice Moskowitz, but only after all but $436,227.32 of the proceeds was dissipated. Thus, had the Knopfs' attorneys been included on the January 12 call and learned of defendants' intention to sell and distribute (rather than escrow) the proceeds, they would have obtained the new escrow order *before* rather than after the February 1 sale, thereby preserving the entire $3 million value of the property. Then that full amount – rather than only the $436,227.32 ordered by Justice Moskowitz into escrow on February 25 – would

have been frozen by an injunction entered by the First Department on March 24, 2016 (*Knopf v. Sanford*, 26 N.Y.S.3d 866 (1st Dept. 2016)) and collected by the Knopfs after a $9,867,832.61 judgment was entered in their favor (*see* A2222-A2223; A1869-A1871). The exclusion of the Knopfs from Akerman's call to Ringel cost them $2.2 million.[2]

## STATEMENT OF THE CASE

### I. Statement of Facts

### A. The Knopfs' Breach of Contract Action against Sanford and Pursuit

In 2000, the Knopfs contributed $11,607,810 to Sanford's "hedge fund," becoming its sole investors. (A1451:1-1452:8.) In 2002, the Knopfs' son, Paul, died in a plane crash. A122,¶25. Sanford ingratiated himself with their family, and between 2003 and 2006 the Knopfs made five loans to Sanford's companies. One, in the amount of $1,690,860, financed Sanford's purchase, through Pursuit, of the 67th Street apartment. A $3.25 million loan financed Pursuit's acquisition of three condominiums on Bedford Street. (A124, ¶28.)

Pursuit was required to deliver mortgages on the 67th and Bedford properties to secure the Knopfs' loans, but did not do so. (*Id.*; A113-114, ¶10.)

---

[2]In 2017, the Knopfs obtained $265,000 traceable to the distributed portion of the proceeds in a settlement with Dechert. (A1327, ¶11.)

11

In 2009, the Knopfs sued to enforce the loan agreements, and demanded money damages and constructive trusts upon the 67th and Bedford properties. (A124-125, ¶30.)

On December 11, 2014, the First Department granted the Knopfs summary judgment on all five loan agreements, including the $1,690,860 loan for the 67th Street apartment. *Knopf v. Sanford*, 1 N.Y.S.3d 18 (1st Dept. 2014). The decision did not determine damages, and denied summary judgment on the constructive trust claim. *Id.*

The trial court (Tingling, J.S.C.) then terminated, without explanation, notices of pendency the Knopfs had filed against the 67th Street and Bedford properties. (A126-127, ¶33.)

While the Knopfs were pursuing a determination of damages, they learned that Pursuit had contracted to sell the property, but not the identity of Phillips as the buyer.

The Knopfs sought to prevent the sale which would transform a fixed asset to cash that could be transferred beyond their reach as eventual judgment creditors. On January 7, 2015, the Knopfs noticed an appeal from the cancellation of the notices of pendency. That February they moved in the trial court for a judgment in the amount of the loans or, alternatively, an attachment. They obtained several

stays and TROs, followed by preliminary injunctions, prohibiting the sale of the property. In July 2015, both that appeal and the motion for judgment or an attachment were denied (instead, a hearing was ordered on the Knopfs' damages), and the preliminary injunctions expired. (A125,¶33-A127,¶38.)

On July 23, 2015, the Knopfs noticed an appeal ("the July, 23, 2015 appeal") from the denial of their motion for either judgment or an attachment. (A127,¶38.) On July 24, they moved in the First Department for a preliminary injunction prohibiting the sale of Pursuit's properties pending that appeal (A227-229), which was assigned Motion No. **M-3660**. (A127,¶39.)

## B. Justice Sweeney's October 22, 2015 Escrow Order

On October 22, 2015, while the July 24 motion (**M-3660**) remained *sub judice*, the Knopfs filed a second motion (**M-5459**) in the First Department requesting reconsideration of the decision that affirmed the cancellation of the notice of pendency. (A222-223; A127, ¶42.) As part of the second motion, the Knopfs requested a stay of the 67th Street sale. (A224-225.) Justice John W. Sweeny denied the requested stay, but issued an order, dated October 22, requiring any sale proceeds to be escrowed. (A225.)

Paul Malon, counsel for Phillips' title insurer, noted in a November 3, 2015 draft email that the escrow order clouded Pursuit's ability to deliver title, stating:

> In [the order], Judge Sweeny states that the proceeds are to be held in escrow. That is not an escrow to be held by the title Company. It prevents us, the title company, from holding a separate escrow to cover the [Meister Seelig] Mortgage. It also does not allow for payment of the mortgage separately.

(A1921-A1922.)

Sanford refused to close if the proceeds had to be escrowed. (A128, ¶44; A129, ¶47.) An internal email produced by Phillips' title examiner states: "Fyi – deal got canned at about 6:30 last night . . . creditors on the L[is] P[endens] got an order that the seller had to put sales proceeds in escrow and [Sanford] wasn't having it." (A1924.).

## C. Sanford's Unsuccessful Cross-Motion to Vacate the Escrow Order

On November 12, 2015, the First Department, with Justice Karla Moskowitz presiding, issued an order (A226), that denied the July 24 motion for a preliminary injunction (**M-3660**). The order did *not* decide or refer to the October 22 motion (**M-5459**) or Justice Sweeny's October 22 escrow order.

On November 20, 2015, Pursuit cross-moved to vacate the October 22 escrow order (A597-640), arguing that it had been terminated by the November 12, 2015 ruling on the prior, July 24 motion (**M-3660**). (A613, A636-637.) Pursuit's cross-motion acknowledged that, because of the October 22 order, "the purchaser's title insurer refused to issue . . . title insurance. . . [.]" (A613.)

The Knopfs opposed the cross-motion, contending:

> At the interim application on October 22, plaintiffs emphasized
> . . . it would be an aberration of justice to permit Pursuit to . . . put the
> proceeds beyond plaintiffs' reach immediately before plaintiffs
> converted their summary judgment into an enforceable judgment lien.
> Justice Sweeny's escrow order was issued, at least in part, in response
> to these concerns. Nothing has changed in this regard since October
> 22. The escrow order should remain in place pending the outcome of
> the appeal scheduled to be argued during the January 2016 Term.

(A699-700, ¶28.)

On December 29, 2015, a First Department panel, which included Justice

Sweeny, *denied* Pursuit's cross-motion to vacate the escrow order. (A229: "The

cross motion for vacatur of the interim order dated October 22, 2015 is denied[.]")

## D. Phillips' Refusal to Close, as A Result of the December 29 Ruling

Citing the December 29 ruling, Phillips again refused to close without

escrowing the proceeds. (A129, ¶47.) As defendant Feldman (Sanford's closing

attorney) swore, "When the closing of the PHC Sale became a possibility,

[Phillips'] title company raised a question as to the meaning of the December 29,

2015 Order's denial of Defendants' cross-motion to vacate all restraints." (A767,

¶7.)

Phillips' refusal was based on these rulings:

| Date | Disposition | Justice/Panel/Court Attorney |
|---|---|---|
| Oct. 22, 2015 | **Proceeds to be paid into escrow (M-5459)** | Sweeny |
| Nov. 12, 2015 | Motion for preliminary injunction (M3660) denied | Moskowitz, *et al.* |
| Dec. 29, 2015 | Motion for reargument of appeal to reinstate notice of pendency (M-5459) denied; **Cross-motion (M-5942) to vacate Oct. 22 escrow order (based on the Nov. 12 order ruling) denied** | Sweeny, *et al.* |

Sanford was free to *sell* the property. If he did, he had to escrow the proceeds since his cross-motion to vacate the escrow requirement was denied on December 29. *Knopf v. Sanford*, 2019 WL 429469, *6 n.1 (where Justice Lebovits notes that distinction, summarizing the procedural history).

Also, the First Department terminates interim relief – such as the October 22 escrow order – *expressly*, even when the underlying motion is denied. *E.g.*, orders at A294-A315. Further, funds subject to real estate contracts may be ordered into escrow even if the requirements for a preliminary injunction are lacking. *Bashein v. Landau*, 465 N.Y.S.2d 178, 179 (1st Dept. 1983)*; Fieldstone Capital, Inc. v. Loeb Partners Realty*, 963 N.Y.S.2d 120, 121-122 (1st Dept. 2013); *Ferguson v.*

16

*Fergus Enterprises, Inc.*, 175 N.Y.S.2d 974, 977-978 (Sup. Ct., New York Co. 1958).

## E. Defendants' Collusion with Ringel to Avoid the Apparent Escrow Requirement

### 1. Sanford's Enlisting of Esposito and Ringel in His Scheme

Sanford was required to move under CPLR 2221 if he desired to renew his attempt to vacate the escrow order or obtain a ruling satisfactory to Phillips. *Arbor Realty Funding LLC v. East 51st St. Dev. Co., LLC,* 890 N.Y.S.2d 14, 14-15 (1st Dept. 2009); *Sablosky v. Sablosky,* 784 A.2d 890,895 (Conn. 2001) ("The appropriate remedy for doubt about the meaning of a judgment is to seek a judicial resolution of any ambiguity; . . . not to resort to self-help.")

Instead of making a motion, on January 4, 2016 Sanford met Esposito, and gave him a copy of the December 29 ruling. (A129,¶50-A130,¶51.) Sanford "absolutely" made Esposito aware of his need to overcome orders impeding an escrow free sale. (A1353:19-A1359:22.)

Esposito showed the December 29 ruling to Ringel, an attorney in the First Department's "Pre-Argument Conference Part," a mediation section. (A129-130, ¶51; A1708.) At Esposito's suggestion (A1895:5-9), Ringel agreed to opine that Sanford was not "aggrieved" by either the December 29 ruling or the October 22

order it upheld. (A727:21-728:9.)  That was not her honest opinion. Ringel would testify that Esposito *never* showed her the October 22 order (A1395:18-24; A1896:7-16) and, regarding the December 29 order, that "I have no way of knowing what the Judges of the Court were thinking when they drafted that order." (A735:6-16.)

On January 11, Sanford and Esposito concluded a written contract that Esposito would receive a $55,000 "fee" (A212-213), but no money changed hands (A130-131, ¶52.)  Instead, Esposito agreed to wait until Sanford achieved "liquidity." (A1354:7-17; A579-A580, ¶6.)

That same day, Ringel called Evan Glassman, a litigator, to see if he was interested in appearing for Sanford in the *Knopf* case, violating her duty of neutrality as a judicial officer. (A2208:8-A2212:24.)

### 2. Akerman's Call to Ringel's Unpublished Number at the First Department and Ringel's *Ex Parte* Opinion

On January 8, Sanford emailed the December 29 order to defendant Nathaniel Akerman (A2217-2218), and Akerman obtained Ringel's unpublished number at the First Department (A1715-1716; A1759-A1762). Akerman was Pursuit's prior appellate counsel (A1541), but had been replaced by Holwell, Schuster & Goldberg (A292-A293).

On January 12, at 9:43 a.m., Sanford sent Akerman email addresses for Feldman and Lori Braverman (Phillips' attorney) with the message: "Nick: pls email them now." (A2219.) At 9:48, Akerman emailed Braverman and Phillips that: "I am available throughout the day, but right now would be best for our quick call. Can we please do it now." (A1920, A664.) Akerman's assumption that Feldman and Braverman knew what he meant by "our quick call," indicates they had discussed a plan. At 10:13, Akerman called Ringel's unpublished number at the Court, 212-340-0539. The call lasted eight seconds. (A1715-A1716, A1759.)

At 10:43 a.m., Akerman called Feldman at 212-685-2277. (A1779.) According to Feldman, Akerman *knew in advance* what they would hear when they called the Court: "[Akerman] called me and said he was advised by the Appellate Division that the restraints were dissolved as a matter of law, and I said, fine, and then when he knew I was on the phone, he called the Appellate Division. . . ." (A657:11-17; A161,¶136(b).) With Feldman on the line, Akerman called Ringel, again at her unpublished direct number. (A1715-A1716; A1759; A1779.)

When Ringel answered, Akerman and Feldman identified themselves as Sanford's real estate lawyers. (A517:15-17; A722:22-A723:22.) As Ringel testified, Akerman and Feldman asked "if I was familiar with the order" they were calling about – an odd question to ask in a Court that issues a hundred or so orders

19

weekly. Ringel confirmed that she was. (A524:21-23.) Ringel did not recuse

herself, nor did she direct that Akerman add the Knopfs' lawyers to the call.

Akerman testified that the termination of the escrow order "was established, . . .

was given to me by Ms. Ringel." (A1938:10-A1939:3.)

On January 12, Feldman and Akerman wrote file memoranda recording their

conversation with Ringel ("the Feldman/Akerman memos"). Feldman's memo

(A230) was forwarded to Braverman and Phillips' title insurer. (A441:23-442:2;

A463, correction for p. 26, line 25.)

### 3. The Decision to Distribute the Proceeds Based On Ringel's *Ex Parte* Advisory Opinion

According to Phillips, the decision to distribute the proceeds was based on

"something in January." (A742:7-13, A743:2-10.) Feldman's *pro se* memorandum

of law states: "Feldman decided that it was not for him to interpret the language of

the TRO [*sic:* escrow order]. As such, no closing could be scheduled until either

the TRO [*sic*] was removed or the language clarified." (A490.) Therefore, "[t]he

morning of January 12, 2016, Akerman called Feldman and then conferenced in

the Appellate Division[.] * * * This conference call [with Ringel] lasted but a few

minutes. Then, based upon this call, the closing took place and the proceeds were

distributed." A491. Sanford agrees that the decision to close and distribute the

proceeds was based on advice he received from Akerman and Feldman on January 12. (A355, ¶¶38-39.)

### 4. Ringel's Recruiting McGuire and Dechert on Sanford's Behalf

On January 14, 2016, the parties appeared at the damages hearing before retired Justice Ira Gammerman, then a Judicial Hearing Officer, who adjourned the matter to January 9. (A139, ¶72.) That day, using her www.nycourts.gov account, Ringel emailed James M. McGuire, Esq., for whom she had clerked when he was a First Department Justice, to see whether McGuire was interested in appearing as Sanford's new counsel. (A665-A671.)

### 5. The Closing and the Payments to Esposito, Dorsey, Feldman, Sanford and Dechert

The sale closed on February 1, 2016, and the entire $3 million was distributed. That day, Sanford offered, and McGuire accepted, $500,000 from the proceeds as Dechert's retainer. (A46, ¶70, A1712).

Esposito received $164,500 out of the proceeds. (A2200-A2204). The rest of the money went to Sanford, Dorsey (A359) and Feldman (A46, ¶70) and creditors other than the Knopfs, though, as purchase money lenders, the Knopfs' equitable lien[3] was superior to the rights of subsequent creditors[4].

---

[3]*M&B Joint Venture, Inc. v. Laurus Master Fund, Ltd.*, 879 N.Y.S.2d 812, 814 (N.Y.App. 2009) ("New York law allows the imposition of an equitable lien if

### 6. JHO Gammerman's Report on the Knopfs' Damages

On February 8, 2016, JHO Gammerman reported that Pursuit owed the Knopfs $8,336,488. The report had to be confirmed before judgment could be entered, which occurred in 2018. *Knopf v. Sanford*, 2018 WL 1769299, *7-8 (Sup. Ct., New York Co., February 9, 2018).[5]

### 7. The Knopfs' Successful Motion to Enforce the Escrow Requirement

On February 24, 2016, the Knopfs learned of the sale and distribution of the proceeds. On February 25, they moved in the Appellate Division for: (i) a preliminary injunction mandating that the remaining proceeds, including Dechert's retainer, be disgorged into escrow, and (ii) to hold Sanford and Dechert in contempt of the October 22 order ("the disgorgement/contempt motion"). (A231-232.) That day, they obtained a new escrow order from Justice Moskowitz, that stated:

> Money remaining as of today at 3:45 pm from sale of
> 1-bedroom apartment shall be placed in escrow as had been directed
> by Justice Sweeny in his 10/22/15 interim order, vacatur of *which was*

there is an . . . agreement 'that there shall be a lien on specific property[.]'")

[4]*Federal Deposit Ins. Corp. v. Five Star Mgmt., Inc.*, 692 N.Y.S.2d 69, 73 (1st Dept.1999),

[5]The delay is explained at *Knopf v. Sanford*, 55 N.Y.S.3d 214, 216 (1st Dept. 2017)

> *denied by this Court's 12/29/2015 Order* (M-5459, M-5942) pending hearing and determination of this motion by full panel and determination.
>
> Expedite motion & decision.
>
> Pending hearing by full panel, money escrowed shall be escrowed with JP Morgan Chase or similar commercial Bank in New York City by close of business on 2/29/2016.

(A234; A143-144, ¶81 (emphasis added).)

In imposing the new escrow order, Justice Moskowitz not only relied on the December 29 ruling denying vacatur of the October 22 order, but also rejected Sanford's argument that the intervening November 12 ruling (A226) had terminated the October 22 escrow requirement. As the Presiding Justice on the November 12 panel (A226), she knew what that ruling intended. She further rejected Sanford's argument that the December 29 decision denied the cross-motion to vacate "as moot," commenting "we don't deny motions as moot without saying so." (A143, ¶81.)[6]

Pursuit transferred $436,227.32, but not the Dechert retainer, into the Moskowitz-ordered escrow (A2222), the rest of the proceeds having been

---

[6]"There is no court reporter available to stenographically record arguments on interim applications." David B. Saxe, "How We Operate at the Appellate Division, First Department: An Insider's View," *New York Law Journal*, July 22, 2016.
https://www.law.com/newyorklawjournal/almID/1202576098782/How-We-Operate-at-the-Appellate-Division-First-Department-An-Insiders-View/

dissipated (A144, ¶82.)

On March 8, 2016, Sanford and Dechert filed their opposition to the Knopfs'
disgorgement/contempt motion. In opposition to the contempt allegations, they
invoked an advice of counsel defense, proffering "legal memoranda" that Sanford
and Phillips allegedly relied on in distributing (rather then escrowing) the
proceeds, but only on an *in camera* basis. (A1714; A144, ¶¶83-84; A146, ¶87.)

On March 16, Sanford filed affirmations from Feldman and Akerman in the
trial court recounting their conversation with a Court Attorney who was not
identified. (A762-A771.)

### 8. The Appellate Division's Injunction

On March 24, 2016, the First Department decided the Knopfs' July 23, 2015
appeal from the denial of their attachment motion. The decision enjoined Pursuit
from: "transferring, or further diminishing, impairing or encumbering the
properties it acquired with real estate loans from plaintiffs, . . . as well as any
proceeds derived from the sale of such properties prior to the date of this order[.]"
*Knopf v. Sanford*, 26 N.Y.S.3d at 866. That injunction froze the $436,227.32 in
the Moskowitz-ordered escrow, the unused $365,849.05 balance of the Dechert
retainer (A2222; A283; A286n.3), and Pursuit's fee interest in the Bedford
properties. The March 24 decision decided only the July 23, 2015 appeal, and did

not address the disgorgement/contempt motion filed on February 25, 2016. (A231-232).

### 9. The *In Camera* Submission of the Feldman/Akerman Memos

On May 16, 2016, while the Knopfs' disgorgement/contempt motion was *sub judice*, the First Department apparently contacted McGuire and requested the "legal memoranda" that Dechert and Sanford had offered to submit *in camera*. A146, ¶87.[7] McGuire submitted the Feldman/Akerman memos, without providing them to the Knopfs or disclosing that Ringel's husband had been paid for the opinion those memos attributed to her. (A147, ¶91.) The First Department did not address the Knopfs' request that the *in camera* documents be provided to them. (A146, ¶87; A1714.)

### 10. The June 16, 2016 Orders

On June 16, 2016, the First Department decided the Knopfs' disgorgement/contempt motion. The order stated that the request for an injunction disgorging the Dechert retainer into escrow had been resolved by the prior March 24, 2016 injunction freezing that retainer balance:

> . . . Ordered that plaintiffs' request for an injunction is rendered

---

[7]The OCA report incorrectly states that only Feldman's was provided. In fact, according to McGuire's letter to the First Department, both were. *Phillips* appeal, Dkt. 18-661, A991.

moot in light of our decision on the appeal (Appeal No. 723, decided March 24, 2016).

A235.

Regarding the contempt application, the order stated: "The motion and cross motion are otherwise denied in all respects." *Id.* The omission of any express reason for the outcome was standard. Saxe, "The Under-the-Radar Work of the Appellate Division," *supra* at fn.6 ("Unlike appellate decisions, motions are disposed of solely by order, with no written decision explaining our reasoning.")

Five days later, an amended version of the June 16, 2016 order (A236) was filed *sua sponte*, without notice to the parties.[8] Regarding the disgorgement request, the amended June 16 order was essentially the same: "The underlying appeal has been decided (March 24, 2016) rendering as moot plaintiffs' request for an injunction pending appeal."

However, concerning the contempt application, the amended order differed from the original because it provided a reason for denying the contempt application, stating: "The motion for contempt is denied because the TRO was

_____

[8]The June 16 order was released by means of a link to a single PDF (which included all 60 orders issued on June 16). Though the amended order retains the June 16 date, the metadata for the PDF of the sixty June 16 orders indicates it was modified on June 21 at 2:56:30 p.m. It was not otherwise released. (A1564-1565, ¶5; A1567:16-A1568:3.)

vacated once plaintiffs' prior motion for a preliminary injunction was denied."

A236. That legal conclusion is identical to that which, as the Knopfs now know, was attributed to Ringel in the Feldman memo submitted to the First Department *in camera.* It states:

> On January 12, 2016 at 10:45AM I had a conference call with Nick Ackerman and Melissa Ringel of the Appellate Division. She confirmed the following:
> 1. The October 22, 2015 Interim Order with restraints was only in effect until motion decided.
> 2. Once full panel decided the motion and entered the November 12, 2015 Order denying the restraints, all restraints were vacated.
> There was no need for the motion to remove interim restraints as they were already gone. The motion [decided on December 29] was denied as a matter of law as there were no restraints to vacate and, thus the motion requested relief that could not be granted.

(A230, bracketed material supplied.)   (The Knopfs have never seen Akerman's memo regarding the call.)

The view attributed to Ringel and submitted to the First Department *in camera* via the Feldman memo was *not* the view of Justice Moskowitz, the *Presiding* Justice on the panel that issued the November 12 ruling (A226).  Hardly finding the October 22 escrow requirement "already gone," Justice Moskowitz enforced it in her new February 25, 2016 escrow order, citing the December 29 ruling as grounds for that outcome. (A234.)

The First Department wouldn't have requested *in camera* submission of the

"legal advice memoranda" had it not viewed the contempt issue as a close one.

Sanford and Dechert hoped that Ringel's opinion, as reported in the Feldman/Akerman memos, would be persuasive on the contempt motion, and possibly it was. What the First Department was entitled to know, and what was concealed, was that Ringel's view as summarized in those memos was tainted by her marriage to one of Sanford's attorneys and her financial interest in the matter. Concealing that information was an attempted fraud on the Court. Apart from these issues, the amended June 16 order is void and without preclusive effect since it was issued *sua sponte* without the Court affording the parties an opportunity to address the proposed modification. (Point III, *infra*.)

## II. Proceedings Before the District Court and OCA

In 2016, the Knopfs filed a lawsuit against Phillips, *Knopf v. Phillips*, 16 Civ. 6601 (DLC), alleging that Pursuit fraudulently conveyed the property to him. On June 22, 2017, Feldman inadvertently produced his file memo concerning the call (A875-A876, ¶34), and the Knopfs thus learned Ringel's identity as the Court Attorney assisting Sanford.[9] Between June 26 and June 30, McGuire, Feldman and Sanford were deposed. The Knopfs then filed this action on July 10, and deposed Akerman, Esposito and Ringel in *Phillips*.

_____

[9]No clawback was requested.

On November 17, 2017, the Knopfs filed a written complaint based on these events with OCA's Inspector General. (A1709.)

Defendants' motions to dismiss the amended complaint in this case were granted on December 7, 2017. (SA1-SA21.) Sanctions and fees totaling $197,857.50, were awarded on March 5, 2018. (SA25-SA47.) Both decisions credited Akerman's and Feldman's contentions (A535, A845, A860n.3) that Akerman did not call Ringel directly but, instead, a "general number" at the First Department and that, in a lightning-strike-twice coincidence, he and Feldman were "randomly" transferred to Ringel. (SA19, SA43.) Akerman's false testimony about being transferred from a general number is quoted at A1974-A1975; and the transcripts are at A1934:21-A1935:11; A1935:12-24; A1937:4-12; A1941:13-19; A1196:24-A1197:8; and A1204:17-22.

The March 16, 2018 OCA report (A1708-A1770) substantiated each of the Knopfs' key allegations. In mid-April 2018, the First Department directed OCA to file the report with the District Court. (A1706.)

The OCA report attached First Department phone records (A1759-1761) which revealed, contrary to Akerman's and Feldman's testimony about being randomly transferred to Ringel, that Akerman called Ringel's *unpublished direct line* (212-340-0539) three times on January 12, 2016. (A1759.) They also revealed

that Akerman had *not* called the Clerk's general number  (212-340-0400) at all that

day. (A1760.)  The report noted:

> . . . [T]he telephone records for Ms. Ringel's direct telephone number at the Appellate Division belie the statements given by Ms. Ringel in the interview with our Office, and the deposition testimony of both Mr. Akerman and Mr. Feldman. Indeed, they all claimed the telephone call was transferred from an internal telephone line within the Appellate Division. However, the telephone records indicate that the three telephone calls from Dorsey & Whitney were made directly to Ms. Ringel's work number.

(A1727.)

OCA also found that Esposito received checks totaling $102,500 following

the closing of the sale. (A1722n.21). Subsequently, checks to Esposito for another

$62,000 from the proceeds were discovered. (A2199-2204.) OCA found that

Ringel and Esposito had spoken about the matter before she received the call from

Akerman (A1711), that Ringel violated Court protocols (A1726) and created "an

appearance of impropriety [that] reflects poorly on the impartiality of the court"

(A1727). Ringel resigned following the report.[10]

Because this case was on appeal when OCA filed its report, the Knopfs

moved for indicative rulings (Fed.R.Civ. P. 62.1) reinstating the case, vacating the

---

[10]Jack Newsham, "NY Court Atty Resigns After Giving Advice To Hubby's Client." *Law360.com*,  available at https://www.law360.com/articles/1036768/ny-court-atty-resigns-after-giving-advice-to-hubby-s-client

sanctions and fees, and leave to file a second Amended Complaint incorporating OCA's findings. (A1787.)  This Court remanded to permit the District Court to decide the motions.  Dkt. 17-4151, Doc. 89; Dkt. 18-668, Doc. 48.  In July 25, 2018, the District Court denied each motion, but reduced Dorsey's sanctions award to $88,928.75 and vacated the separate $20,000 award in Esposito's favor. (SA69-SA70.)

## STANDARD OF REVIEW

Under Rule 12(b)(6), complaints are construed in the light most favorable to the plaintiff, accepting as true well-pleaded facts, and plausible inferences are drawn in the plaintiff's favor.  *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2008); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Civil rights claims are construed "especially liberally." *United States v. City of New York*, 359 F.3d 83, 91 (2d Cir. 2004).

On appeal, a Rule 12(b)(6) dismissal is reviewed *de novo*, *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230 (2d Cir. 2016), as is an award of fees under §1988, *Hines v. City of Albany*, 862 F.3d 215, 219 (2d Cir. 2017).  A grant of sanctions under §1927 is reviewed for abuse of discretion. *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000).

## SUMMARY OF ARGUMENT

This appeal raises legal issues similar to those this Court decided in *Motors Liquidation*. Under *Motors Liquidation*, the reviewing Court is required *first* to determine whether a due process violation or "procedural defect" occurred. If so, then the Court should determine whether, *at the time the defect occurred*, the error appeared to prejudice a party. If a possibility exists, based on the entire record, that the procedural defect (here, the exclusion of the Knopfs from Akerman's call) deprived the injured party of the ability to protect itself, the due process claim should be sustained. *Motors Liquidation* thus necessarily (and also expressly) rejects the use of hindsight to cleanse prejudice that apparently existed at the time of the procedural defect. The *Motors' Liquidation* approach is on a continuum with the Court's past rulings. *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (whether procedural defect occurred is determined as of the time of the violation); *accord: Hanrahan v. Doling*, 331 F.3d 93, 98-99 (2d Cir. 2003); *Johns-Manville Corp. v. Chubb Indemnity Ins. Co.*, 600 F.3d 135, 155 (2d Cir. 2010) ("*Chubb*") (rejecting retrospective analysis of prejudice).

After the OCA Report, the District Court held that the Knopfs did not "have a right to participate in the January 12, 2016 telephone call." (SA63), a finding that no procedural defect occurred. It explained:

32

[Ringel] simply gave an accurate description of duly issued court orders, specifically the effect of the November 2015 Order on the October 2015 Escrow Order. That her account was correct is confirmed by the June 2016 Order. The Knopfs' due process rights were not violated because they were excluded from that call. New York state court process gave avenues of redress from the November 2015 Order. They had the right to seek reconsideration of the November 2015 Order, or to appeal that order. Due process did not require their participation in an explanatory telephone call to court staff.

SA63-SA64.

The District Court's reasoning is factually incorrect. The Knopfs did promptly and successfully "pursue avenues of redress" from the November 12, 2015 ruling, as detailed infra at pp. 38-39. Legally, what happened was not merely "an explanatory call to court staff," it was both state action under §1983, and adjudicative action under the *Rules of Professional Conduct*, §1(w) and thus subject to the prohibition against *ex parte* communications with the tribunal, *id.*, §3.5, Comment [2].[11] The District Court overlooked defendants' admissions that they were attempting an end-run around the effect of the December 29 ruling; the financial *quid pro quo* Esposito received; Ringel's conflict of interest; OCA's findings that Ringel violated First Department procedures; and the identical false

---

[11]Section 1.0(w) provides that an official, court, legislative body or agency "acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party  or parties, will render a legal judgment directly affecting a party's interests in a particular matter."

accounts of a transferred call that establish guilty knowledge.

Analytically, the District Court's approach is the *reverse* of that mandated in *Motors Liquidation.* It is *purely* retrospective, relying solely on hindsight provided by the amended June 16, 2016 order – the *sua sponte* ruling possibly based on the *in camera* submission of the Feldman/Akerman memos – to cleanse the prejudice that appeared to exist at the time of the call. The District Court first determined that the amended June 16, 2016 order meant that Ringel had been correct, after all, in her *ex parte* opinion that no escrow requirement was in place (even though it was rendered shortly after the First Department upheld the escrow requirement on December 29). Working backwards, the District Court found that, since Ringel's opinion (in the District Court's view) had been correct, she did nothing wrong in stating it and Akerman did nothing wrong in soliciting it without notice to the Knopfs.

The following legal argument follows *Motors Liquidation*'s structured approach.

Point I will show that two procedural defects occurred – namely, deprivations of the Knopfs' due process rights (i) to notice and opportunity to be heard; and (ii) to a neutral decision-maker. It will further show that defendants are properly charged with conspiring to violate §1983 in causing those deprivations.

Point II-A shows that, at the time of the January 12, 2016 *ex parte* call, the Knopfs were apparently prejudiced by that procedural defect, given that the December 29, 2015 ruling appeared to all concerned (Feldman, Phillips' title insurer and Justice Moskowitz) to leave the escrow requirement in place.

Point II-B demonstrates that the record as a whole, in particular the effect of Justice Moskowitz' February 25, 2016 escrow order and the March 24, 2016 injunction freezing Pursuit's assets, indicates the likelihood that the Knopfs could have avoided their $2.2 million loss had they been on Akerman's call, notwithstanding the amended June 16, 2016 order.

Point III establishes that the amended June 16, 2016 order is void and without preclusive effect since it was issued *sua sponte* and without affording the parties an opportunity to oppose the Court's revision.

Point IV shows that if the Knopfs have not alleged prejudice within the meaning of *Motors Liquidation*, the Court should hold that a procedural due process claim does not require a showing of prejudice.

.      Point V  shows that the sanctions and fee award should be vacated.

# ARGUMENT

## Point I

### The Knopfs Adequately Allege A Conspiracy
### Among Defendants to Deprive Them of
### their Right to Due Process of Law

**A.    The Knopfs Were Deprived of the Rights to Notice and
Opportunity to Be Heard and to a Neutral Decision-Maker**

Akerman admits that he called Ringel to understand the interplay of three

separate orders.  A512:10-A513:6.  Feldman admits, "*based upon this call [to*

*Ringel]*, the closing took place and the proceeds were distributed" and the call was

intended to defeat Knopfs' judicial "efforts to stop the sale" (A490).  Feldman's

admission that the decision to sell and distribute the proceeds was based on

Ringel's telephonic "opinion" is uncontroverted.  (A355, ¶¶38-39; A742:7-

A743:10.)

*Of course*, the Knopfs had a right to participate in an application for

declaratory type relief that was intended to – and did – inflict a serious injury upon

them.  Any time government intervention places property "in jeopardy," "it does so

subject to the due process clause." *National Council of Resistance of Iran*, 251

F.3d 192, 205 (D.C. Cir. 2001); *accord: Mennonite Board of Missions v. Adams*,

462 U.S. 791, 798 (1983).

The District Court found, however, that at the end of the day Ringel only

36

gave Akerman and Feldman a correct interpretation when she told them that the intervening November 12 ruling terminated the October 22 escrow requirement. (SA63-SA64.)

First, that was not what Ringel actually told Akerman and Feldman. When deposed, she testified that "she didn't specifically recall" whether the November 12 order "c[a]me up" during the call. A733:4-10. She also testified that she told Akerman and Feldman that it was the December 29 ruling – *i.e.*, that which decided both a motion and a cross-motion – rather than the November 12 order, which had terminated the escrow requirement. (A734:17-25.) Second, even if Ringel did tell Akerman that the November 12 order terminated the escrow requirement, and even if that were correct, this Circuit specifically rejects the view that a correct outcome would mean that the Knopfs didn't have a right to be on the call. If that view were right, a judge could notify only one side of a hearing and then rule against the absent party without a due process violation occurring so long as the ruling was correct on the merits. However, *Motor Liquidation* cites with approval *Lane Hollow Coal Co. v. Dir., Office of Workers' Compensation*, 137 F.3d 799, 808 (4th Cir. 1998) for the point: "If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of results." (quoted at 829 F.3d 163) *Accord: Krimstock v.*

37

*Kelly*, 306 F.3d 40, 48-49 (2d Cir. 2002) (Sotomayor, J.) ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing," (internal quotation omitted).)

Because the Knopfs had *no* day in court in connection with the call that cost them $2.2 million, whether Ringel's opinion was legally right or wrong is, under *Motors Liquidation*, *Lane Hollow* and *Krimstock*, irrelevant to whether a procedural defect occurred.

Third, it's hard to see how Ringel got it right. The Knopfs *successfully* opposed Sanford's cross-motion in which he argued that the November 12, 2015 order warranted the *vacatur* of the October 22 escrow requirement. (A634-A637; A229.) Next, when the Knopfs argued to Justice Moskowitz that her November 12 order did not terminate the October 22 escrow requirement, she *agreed* and enforced the escrow requirement in her February 25 ruling. (A143-A144, ¶81; A232.) Then, the March 24, 2016 decision on the appeal granted the Knopfs precisely the injunction that the November 12 order had denied them, thereby enabling them to eventually execute on Pursuit's remaining assets. If Ringel was right, the actual Justices were wrong three times.

Ringel's "opinion" was the sole occasion in which any judicial officer at the First Department determined that the sale proceeds could be disbursed as opposed

to being placed in escrow; and she arrogated to herself the decision of the issue that the parties had been litigating for a year, which was soon to be argued before the actual Justices.

The District Court did not consider the rules against *ex parte* communications with a Court. *Dinova*, *supra*; Rules of Professional Conduct, §3.5(a)(2)(i)-(iii) (SA74) (prohibiting *ex parte* communication with "employees" of "tribunals"); N.Y.S. Advisory Committee on Judicial Ethics, *Opinion* 15-69 (SA74) ("Court attorney referees must obey the Rules Governing Judicial Conduct while performing their judicial duties"); ABA, *Ethical Consideration* 7-35 (prohibiting *ex parte* "oral communication" between a lawyer and judicial officer); *accord:* NYSBA, *Ethics Opinion* No. 420.

Defendants also intentionally sought the intervention of a governmental decision-maker who, because of her financial interest and marriage to Esposito, couldn't possibly meet the neutrality requirement. *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (due process requires that the "decision-maker" be "neutral and detached"); *Ward v. Village of Monroeville*, 409 U.S. 57, 59 (1972) (due process violation occurs when "judge . . . has a direct, personal, substantial pecuniary interest in reaching a conclusion").

Ringel had also "prejudged" the issue, informing Esposito a few days before

39

the call that she would opine in Sanford's favor regarding one order she hadn't

seen (that dated October 22) and another she didn't understand (that dated

December 29). (A1395:18-24; A1896:7-16; A735:6-16.) *Williams v.*

*Pennsylvania*, 136 S.Ct. 1899, 1905 (2016) (neutrality under the due process clause

is determined by objective, rather than subjective, standard).

**B. The Knopfs Adequately Allege A Conspiracy to Violate §1983**

**1. A State Actor Participated in the Scheme**

A §1983 conspiracy requires participation of a "state actor," *Pangburn v.*

*Culbertson*, 200 F.3d 65, 72 (2d Cir.1999); here Ringel. Liability under §1983

extends to a private party who is "a willful participant in joint activity with the

State or its agents." *Adickes*, *supra*, 398 U.S. at 152. Following OCA's revelation

that Akerman called Ringel directly on her unpublished private line (212-340-

0539) three times, and did not call the clerk's general number (212-340-0400) at all

(A1761), Dorsey disclosed its own phone records, which were identical to OCA's.

(A1778.) Akerman's and Feldman's joint participation with a state actor is

established. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 942 (1982) ("joint

participation" requires no more than "invoking the aid of state officials").

### 2. Akerman's Possession of Ringel's Unpublished Number Is Evidence of a Hub and Spoke Conspiracy

Akerman undoubtedly received Ringel's unpublished work number from Sanford, Esposito and/or Ringel. *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (participation proven by "possession of items that are of essential significance to the conspiracy"). Relaying Ringel's unpublished number to Akerman establishes the "rim" of a hub-and-spoke conspiracy, with Sanford and Esposito as the "core group" and Ringel, Akerman and Feldman as spokes. *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (rim consists of connections between the spokes); *United States v. Estrada*, 441 F.2d 873, 879 (9th Cir. 1971) (rim established because "The items seized in John's home tied him to Hernandez, Lannom, and Jacobo.").

A privilege log (A2162-A2163) shows that on January 12, *Sanford* sent Akerman the first draft of Akerman's memo summarizing the call with Ringel. *Id.* at Item 3 ("Email regarding draft memorandum with draft memorandum attached"). It also shows that Sanford sent Akerman five other emails that day about the file memo. *Id.* If Akerman's file memo was intended to accurately record the conversation with Ringel, there would be no need for Sanford's input.

Sanford was herding Akerman and Feldman in his effort to obtain a written account of the call that would satisfy Phillips' title insurer, just as he had herded

Ringel by promising to pay her husband $55,000. *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 693-694 (S.D.N.Y. 2013) (Cote, J.), *aff'd* 791 F.3d 290 (2d Cir. 2015) (hub-and-spoke price fixing conspiracy was established by Apple's "herding" publishers – the spokes – and "nurturing" their "collective action").

Since a hub-and-spoke conspiracy is pleaded, whether Akerman and Feldman reached an independent agreement with Ringel is irrelevant (*United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995)), although likely Akerman did, since he knew in advance what the outcome of the call would be ((A657:11-17)).

### 3. The Ethical Violations by Akerman, Feldman and Ringel Support the Conspiracy Allegations

Apart from the phone records, both a traditional conspiracy (express agreement) and conscious parallelism (tacit agreement) may be inferred from the ethics violations by Akerman, Feldman and Ringel.

An express agreement is likely because the scheme would have failed had Akerman and Feldman not violated attorney ethics rules by calling their ally, Ringel, directly. Had they included the Knopfs on the call to Ringel, the Knopfs would have sought the intervention of an actual judge the next day. Had they actually called a general number in the Clerk's office, or had Ringel recused herself, Akerman and Feldman would have been transferred to neutral Court personnel who would have declined to entertain their inquiry, as OCA noted.

42

(A161,¶136(c); A1714, A1727.)  AREEDA & HOVENKAMP, ANTITRUST LAW: AN

ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, vol. IV, §1425a,

p.187 (4th ed.) ("If the actual defendants could not or would not have acted as they

did without advance communication and understanding, then their action

necessarily proves a traditional conspiracy."); *Seven Seas Petroleum, Inc. v. CIBC*

*World Markets, Corp.*, 2010 WL 2277489, *10 (S.D.Tex., June 4, 2010)

(allegation that a defendant helped corporate Directors violate their duties by

"conceal[ing] material information * * * necessarily implies an agreement[.]")

The December 7 decision – which predated the OCA Report – found no

evidence that Ringel had joined a conspiracy before receiving the call.  That

finding overlooked Ringel's informing Esposito a week earlier that she would give

an opinion suiting Sanford's needs (A727:21-728:9), even though she hadn't seen

the October 22 order (A1896:7-16) and didn't understand the December 29 order.

(A735:6-16).  Ringel's "opinion" thus stemmed not from "chance, coincidence,

[or] independent responses to common stimuli," but "an advance understanding

among the parties."  Areeda, ANTITRUST LAW, *supra*.  Similarly, *Victory v. Pataki*,

*supra*, reinstated a §1983 claim alleging that Parol Board Officials and the

Governor's staff conspired to fabricate a pretext for rescinding the plaintiff's

parole because:

> . . . phone records corroborating Victory's contention that the conversation between Lapp, Tracy, and Grant that allegedly identified Victory's escape as a basis for rescission preceded [Parole Board Commissioner] Graber's own purported realization that he had overlooked the escape.

814 F.3d at 68.

The phone records attached to the OCA report show that on January 11 – the day before the call – Ringel called Evan Glassman, a litigator (A1759, calls to 212-506-3903.) Ringel called to see if Glassman was interested in appearing in the *Knopf v. Sanford* matter. (A2209:16-21; A2210:9-17; A2211:21-2212:23.)  Ringel was not neutral but working for Sanford before receiving Akerman's call.

A tacit agreement can be inferred from parallel conduct and "plus factors." *Gelboim v. Bank of America*, 823 F.3d 759, 781 (2d Cir. 2016).

Parallel conduct occurred:  Sanford's and Esposito's eliciting Ringel's purported view that Sanford was not "aggrieved" by the orders, followed by Akerman and Feldman calling Ringel to hear her state that view.

Plus factors are  "circumstances under which . . . the inference of rational independent choice [is] less attractive than that of concerted action." *In re Interest Rate Swaps Antitrust Litig.*, 261 F.Supp.3d 430, 463 (S.D.N.Y. 2017) (quoting *In re Ins. Brokerage Antitrust Litig.*, *supra*, 618 F.3d at 323).  They "include . . . conduct that is contrary to the defendants' independent self-interest[.]" *In re*

44

*Currency Conversion Fee Antitrust Litig.*, 773 F.Supp.2d 351, 366 (S.D.N.Y. 2011). The ethics violations committed by Akerman, Feldman and Ringel in proceeding on an *ex parte* basis were contrary to independent self-interest. ABA, *Model Rules of Professional Conduct: Preamble & Scope* (August 15, 2018) (recognizing "the lawyer's own interest in remaining an ethical person"); *Wheat v. United States*, 486 U.S. 153 (1988) (syllabus) ("courts have an independent interest in assuring compliance with ethical standards and the appearance of fairness").

Akerman also violated ethical duties by calling Sanford's self-selected and self-dealing decision-maker knowing what Ringel would tell them. (A657:11-17; A161, ¶136(b).) *Dubose v. Kelley*, 187 F.3d 999, 1003 (8th Cir. 1999) ("An attorney . . . who participates in corrupt proceedings by . . . practic[ing] in front of a judge who is known to have preordained an outcome in the attorney's favor serves . . . to compound the corruption.")

### 4. The Identical Incorrect Accounts Provided By Akerman, Feldman and Ringel Support the Conspiracy Claim

Akerman's, Feldman's and Ringel's identical accounts of a transferred call prove that they concocted that explanation. *Pearl v. City of Long Beach*, 296 F.3d 76, 87 (2d Cir. 2002) (concluding that "the officers . . . agreed to present their allegedly false versions" given the identical nature of their testimony). *Zelmer v. Constantine*, 2015 WL 417994, **2-3 (W.D. Wash, Jan.30, 2015) found "clear and

convincing evidence of fraud on the court" where "all four officers presented the same incorrect account, and that counsel made arguments based on those . . . accounts."

"'[F]alse exculpatory statements. . . may also tend to prove knowledge and intent of a conspiracy's purpose[.]" *United States v. Anderson*, *supra*, 747 F.3d at 60

### 5. Dorsey's Conscious Avoidance Supports the Conspiracy Claim

Following the OCA report, Akerman filed a declaration that he was "unable to find any record or note that reflects how I obtained a direct phone number for Ms. Ringel, and I have no memory of doing so." (A1773-A1774, ¶7.) When the Knopfs asked Dorsey whether the material Akerman searched included his emails from Sanford, Dorsey's attorney responded: "We regard such communications as confidential information as to which our former client controls release, and permission for release has not been granted. For that reason, I have not investigated whether such an email exists." (A1888-1889.) "[C]onscious avoidance" may sufficiently show conspiratorial *scienter*. *United States v. Eltayib*, 88 F.3d 157, 170 (2d Cir. 1996)

## C. Ringel's Approval of an Escrow Free Sale Was State Action

"The involvement of a state official in such a conspiracy . . . provides the

state action . . . whether or not the actions . . . were officially authorized, or lawful[.]" *Adickes*, *supra.* The state action requirement is met also because defendants obtained Ringel's advisory opinion specifically because she was a Court attorney, as Feldman conceded. (A490.) *Tierney v. Vale*, 304 F.3d 734, 741 (7th Cir. 2002) ("using [governmental] office to magnify the impact of" the state actor's conduct satisfies the state action requirement).

New York rules do not authorize a Court Attorney to participate in an *ex parte* call or render an advisory opinion. That does not alter the state action analysis. *West v. Atkins*, 487 U.S. 42, 49, 55-56 (1982) (under the "functional test," state action inquiry focuses on "the nature of the governmental actor's conduct, rather than the terms of [her] employment[.]"); *accord: Adickes*, *supra*; *Rules of Professional Conduct*, §1.0(w) (functional definition of "adjudicative" action).[12]

## D. The Knopfs Also State A Substantive Due Process Claim

Ringel's self-dealing and the *ultra vires* conduct support a substantive due process claim. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007) ("if the Town Board's . . . actions were *ultra vires* . . . [,][they were] sufficiently arbitrary to amount to a substantive due process violation"); *Ecotone*

---

[12]*See* n.11, *supra.*

*Farm LLC v. Ward*, 639 Fed.Appx. 118, 125-126 (3d Cir. 2016) ("corruption and self-dealing" consisting of official's "collecting of fees" for personal benefit sufficiently conscience-shocking to state substantive due process claim); *Lipson v. Snyder*, 701 F.Supp. 541, 544-545 (E.D.Pa. 1988) (defendants "covert *ex parte* meetings and telephone conversations" with judge stated substantive due process claim).

## Point II

### Under *Motors Liquidation*, and the *Mathews v. Eldridge* Balancing Approach, The Knopfs Have Adequately Alleged Prejudice

*Motors Liquidation* arose out of federal efforts to revive the U.S. auto industry. It concerned a bankruptcy court's §363 sale order approving the transfer of "Old GM" assets to "New GM." Following the sale, New GM recalled the 2005 Chevrolet Cobalt, and the issue was whether the §363 order's "free and clear" provision extinguished product defect claims given the lack of notice to purchasers. The bankruptcy court dismissed the Cobalt purchasers' due process argument, ruling that, though they were entitled to but did not receive, actual notice, they were not prejudiced, since other creditors had filed (unsuccessfully) the same objections they would have made. *In re Motors Liquidation Co.*, 529 B.R. 510, 557, 565-573 (Bankr., S.D.N.Y. 2015).

Reversing, this Court recognized:

> [I]t is difficult to evaluate *in hindsight* what the objections would have been had plaintiffs participated in the § 363 sale. Perhaps [the plaintiffs] would have tried to identify some legal defect in the Sale Order, asked that economic losses or pre-closing accidents arising from the ignition switch defect be exempted from the "free and clear" provision, or requested greater priority in any GUC Trust distribution.

*Motors Liquidation*, 829 F.3d at 163. The decision held:

> [A]ssuming plaintiffs must demonstrate prejudice, they have done so here. After examining the record as a whole, we cannot say with fair assurance that the outcome of the §363 sale proceedings would have been the same had Old GM disclosed the ignition switch defect and these plaintiffs voiced their objections to the "free and clear" provision. *Because we cannot say with any confidence* that no accommodation would have been made for them in the Sale Order, we reverse.

*Id.* (emphasis added); *id.* ("we cannot say with fair assurance that the outcome of the §363 sale proceedings would have been the same had [the required actual notice been provided]").

Under *Motors Liquidation*, the Knopfs were harmed by Ringel's *ex parte* conduct, not by an actual order of an actual Justice. Each time the First Department faced the choice of either (a) of imposing or enforcing an escrow requirement, or (b) permitting the sale proceeds to be distributed, it opted for the former. That occurred in the rulings of October 22, 2015; December 29, 2015; February 25, 2016; March 24, 2016; June 16, 2016; and, as detailed below, May 9,

49

2017.

## A. The District Court's Hindsight Analysis of the Knopfs' Prejudice Allegation Was Improper

The District Court concluded that the amended June 16, 2016 ruling cleared up "confusion" existing at the time of Akerman's call about whether an escrow requirement was then in effect, and retroactively cleansed[13] the prejudice the Knopfs suffered from that call.  (SA40-SA42 SA17, SA63-SA64.)  That retrospective approach is prohibited in this Circuit.

*Motors Liquidation* held that the impact of the procedural defect on the claimant's ability to protect itself  – through legal arguments, negotiations or procedural maneuvers – is assessed *as of the time* the procedural defect occurred, here, January 12, 2016.  829 F.3d at 164 ("we can say that the . . . circumstances *at the time* [the requirement of actual notice was violated] were such that . . . the opportunity to participate in the proceedings would have been meaningful" (emphasis added)).

*Motors Liquidation* expressly rejects using hindsight to cleanse the prejudice that appeared to exist at the time of the procedural defect.  829 F.3d at 163 ("[I]t is difficult to evaluate *in hindsight* what the objections would have been had

---

[13]*People v. Burts*, 571 N.Y.S.2d 418, 420 (Ct.App. 1991) (". . . [T]he . . . taint of the . . . improper photo procedure cannot be retroactively cleansed . . . *nunc pro tunc*, . . [.]")

plaintiffs participated in the §363 sale. * * * But this uncertainty about the content of plaintiffs' objections is the natural result of the lack of any meaningful opportunity to be heard in the § 363 sale proceedings."); 829 F.3d at 163 (emphasis added.); *id.* at 161 (*rejecting* the bankruptcy court's holding that "there is no prejudice if *in hindsight* the outcome would have been the same with adequate notice").

When Akerman called Ringel on January 12, 2016, the December 29, 2015 denial of the motion to vacate the escrow order appeared to leave it in effect. Phillips' title insurer believed that to be the case (A767, ¶7), as did Justice Moskowitz (A233-A234). Pursuit's lawyer, Jennings Durand, found the December 29 order "troubling" given the failure to escrow the proceeds (A145, ¶85). Feldman admits he and Akerman called Ringel because "no closing could be scheduled until either the TRO was removed or the language clarified." (A490.)

Likewise, under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the critical factor– "the *risk* of erroneous deprivation" – is assessed *at the time* of the procedural defect, here, when Akerman called Ringel. *Hanrahan v. Doling*, 331 F.3d 93, 98-99 (2d Cir. 2003) (citing *Mathews*; "[T]he very concept of fair notice necessarily turns on what defendants believed *ex ante* at the time they allegedly denied Hanrahan the procedural safeguards that may have prevented Hanrahan's

mistaken SHU confinement."); *Ashley v. Jones*, 2005 WL 2043647, *6

(Tenn.App., Aug.24, 2005) (citing *Mathews*; "We do not agree that hindsight is the

way to measure the risk of erroneous deprivation without the opportunity to be

heard."); *Giusto v. City of San Mateo*, 2006 WL 805072, *7 (Super.Ct., Calif., San

Mateo Co., Mar.30, 2016)  (citing *Mathews*; "[O]ur due process analysis does not

turn on hindsight. The purpose of due process . . . is to minimize the risk of an

erroneous deprivation[.]")

    *Bogdan ex rel. Parra v. Marsh USA, Inc.*, 319 F.Supp.3d 633 (S.D.N.Y.

2018), which arose out of the *Johns-Manville* asbestos settlements, confirms that

any hindsight provided by the amended June 16 order cannot defeat the showing of

prejudice.

    At issue in *Bogdan* was a "channeling injunction" entered in 1986 as part of

the original *Johns-Manville* asbestos settlement. That settlement established the

"Manville Trust," funded by Manville's insurers and Marsh, its insurance broker.

The settlement was negotiated by a Future Claims Representative ("FCR")

appointed to represent asbestosis victims whose symptoms were not yet manifest.

As part of the settlement, the bankruptcy court approved, on the parties' consent,

an order that enjoined claims against the insurers and Marsh that "related to"

Manville's insurance coverage, "channeling" them to the Manville Trust.

Plaintiffs thereafter began to bring non-derivative claims against Manville's insurers and Marsh. These did not derive from Manville's policies but instead from theories of direct liability, such as conspiring to hide asbestos hazards from the public.

Ultimately, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) held that the channeling injunction did apply to these non-derivative claims (since they "related" to Manville's coverage in the sense that Travelers' knowledge of the hazards was obtained in its capacity as Manville's insurer). *Id.*, at 143-144, 148. *Bailey* rejected the argument that the channeling injunction was predicated on a 1985 letter agreement stipulating that non-derivative claims would not be enjoined, finding the argument contrary to the unambiguous language of the injunction as entered. *Id.* at 150. *Bailey* also held that parties who had not received due process leading up to the 1986 settlement could challenge the bankruptcy court's jurisdiction to enjoin their claims.

In 2009, Parra, an asbestosis victim, sued Marsh, alleging that it conspired to conceal asbestos hazards. The bankruptcy court enjoined the suit under the channeling order, found that Parra received due process and hadn't been prejudiced, and cited *Bailey* as a *post hoc* determination that the FCR had agreed that the channeling order would bar non-derivative claims.

Reversing, Judge Rakoff ruled that Parra was prejudiced since the FCR had approved the 1986 settlement *believing* that the channeling injunction would not prohibit future non-derivative claims. *Bogdan*, *supra*, 319 F.Supp.3d at 642-643. He therefore held that *Motors Liquidation* prohibited applying the 2009 holding in *Bailey* retrospectively to defeat Parra's claim of prejudice: "It is difficult to evaluate *in hindsight* whether the outcome would have been any different had the FCR adequately represented future claimants as to these claims." 319 F.Supp. 3d at 643 (emphasis added). Here, the amended June 16, 2016 ruling – like the Supreme Court decision in *Bailey* – did not retroactively cleanse the prejudice stemming from the procedural defect.

In *Bogdan*, Judge Rakoff, citing the 1985 letter agreement, held that *when* the 1986 orders were being negotiated, "overwhelming evidence indicate[d] that no one believed that the bankruptcy court could bind future claimants as to their non-derivative claims against third parties," and that the FCR therefore believed such claims to be outside the scope of his representation. *Id.* at 643.

Just as the 1985 letter agreement in the *Manville* bankruptcy created (at the time the FCR negotiated the 1986 orders) the *appearance* that the channeling order would not enjoin non-derivative claims, here the December 29 decision created (at the time of Akerman's call) the *appearance* that the escrow order remained in

place.  At that time, the overwhelming evidence indicates that none of the relevant

players – *e.g.*, Phillips's title insurer, Feldman and Justice Moskowitz – believed

that the escrow requirement had been terminated by the November 12, 2015 ruling.

*Chubb, supra*, 600 F.3d at 155 (2d Cir. 2010) (prejudice analysis mandated under

*Bailey* concerns what was "contemplated . . . during the proceedings that led to the

1986 Orders").

**B.  The Entire Record Establishes that the Knopfs'
       Would Have Avoided Their Loss Had they
       Been Included in Akerman's Call to Ringel**

The District Court ruled that the amended June 16, 2016 order retroactively

established that the Knopfs damages were caused by the November 12, 2015 order,

rather than by Ringel's  opinion, and that the Knopfs had "avenues of redress"

from the November 12 ruling that they did not pursue. (SA63-SA64.)

First, the Knopfs did pursue avenues of redress from the November 12 order,

did so immediately and with unqualified success (*supra*, pp. 38-39), and *still* lost

$2.2 million.

The District Court incorrectly focused on the amended June 16 order to the

exclusion of the rest of the record.  *Motors Liquidation*  requires that:

> [T]he *entire record* must be considered and the probable effect
> of the error determined in light of all the evidence. [I]f [the court]
> cannot say, with fair assurance, after pondering all that happened . . .
> that the judgment was not substantially swayed by the error," then it

must find a procedural due process violation.

829 F.2d at 162-163 (emphasis added, internal citations omitted).

Considering the *entire* record, the Knopfs' $2.2 million loss was caused because they were excluded from Akerman's call to Ringel, not by reason of the November 12, 2015 order.

Had the Knopfs' attorneys been included on Akerman's call on January 12, 2016, they would have learned of Pursuit's intention to close on the sale without escrowing the proceeds. They would then immediately have filed an application in the First Department, and obtained an order enforcing the escrow requirement, before the sale occurred. One *can* be confident that this would have happened because of what actually did: On February 24, 2016, the Knopfs learned of the sale and failure to escrow the proceeds, and on February 25, they obtained a ruling from Justice Moskowitz enforcing the escrow requirement (A233-234), but only after all but $436,227.32 of the proceeds had been dissipated.

A new escrow order obtained on or about January 13 would have either prevented the sale (since Sanford didn't want to sell unless proceeds could be distributed (A1924)) or resulted in the entire $3 million in sale proceeds being escrowed. In either case, the ensuing March 24, 2016 Appellate Division injunction, which froze both Pursuit's fee interest in the properties and any

proceeds remaining from their sale (*Knopf v. Sanford*, 26 N.Y.S.3d at 866), would have preserved the entire $3 million value until the Knopfs' judgment lien came into effect.

In his 2019 decision holding Sanford liable as an *alter ego* for Pursuit's judgment debt to the Knopfs, Justice Lebovits considered the District Court's view that "'any confusion' over the escrow requirement 'vanished after the Appellate Division issued its June 2016 order.'" *Knopf v. Sanford, supra*, 2019 WL 429469, at *6 (quoting *Knopf v. Esposito*, 2018 WL 1226023, at *5). And Justice Lebovits also cited the Knopfs' position that:

> [Ringel's] opinion, the Knopfs claim and the OCA Report confirms, caused the . . . sale to close without an escrow deposit. And Sanford (and perhaps others), the Knopfs allege, violated the Court's orders of October 22 and December 29, 2015, *confirmed by the Court's February 25 order*, by not escrowing the sale proceeds.

*Knopf v. Sanford,* 2019 WL 429469 at *6 n.1 (emphasis added).

Justice Lebovits then agreed with the Knopfs, holding: "The court attorney's opinion enabled Sanford to close on the sale. Without their placement into escrow, the sale funds went unprotected from disbursement, and the Knopfs lost a $3 million asset on which to collect a judgment." *Knopf v. Sanford*, 2019 WL 429469,*5-6.

The District Court overlooked that the amended June 16, 2016 order did *not*

undo the Moskowitz ordered escrow, or the asset freeze imposed by the March 24, 2016 injunction.  To the contrary, the amended June 16 order *relied* on the March 24 injunction as already having decided the Knopfs' disgorgement request (since the March 24 injunction had frozen that retainer in trust (A236)).  By stating that the disgorgement request had been already been decided, the amended June 16 order ratified the *Knopfs'* win on that issue. *Cangro v. Rosado*, 2014 WL 658366, *3 (Sup. Ct., New York Co., Feb.1, 2014) ("That portion of defendant's motion [seeking] an order enjoining plaintiff . . . is deemed moot, as such an injunction was granted by the Appellate Division . . . in its recent decision.")

In fact, in 2017, the First Department rejected (see A279-A280) a cross-motion by Dechert (A281-A291) which asserted that the June 16, 2016 ruling had dissolved both Justice Moskowitz' February 25, 2016 escrow order and the March 24, 2016 freeze of its retainer.  Dechert contended: "the June 16 Order denying the contempt motion necessarily meant that the Interim October [escrow] order (Sweeny, J.) had earlier terminated and also operated as a matter of law to dissolve the Interim February Escrow Order (Moskowitz, J.)" (A290.) The Knopfs disagreed, pointed out that the June 16 ruling *relied on,* and did not undo, the March 24 injunction, citing *Cangro*, *supra*. (A759-A760.)   The First Department denied Dechert's request to lift the freeze in a May 9, 2017 order, and instead, at

the Knopfs' request, extended the March 24, 2016 injunction. (A280.) The First Department thereby definitively rejected the argument that Justice Moskowitz' escrow order and the March 24 asset freeze were dissolved by the June 16, 2016 ruling.

Considering the entire record, each of the six First Department decisions that addressed a request to distribute the sale proceeds – those dated October 22 and December 29, 2015; February 25, March 24 and June 16, 2016; and May 9, 2017 – denied the request and ordered the proceeds to be paid into or retained in escrow. Because of these orders, following judgment, the Knopfs collected the $436,227.32 remaining at the time Justice Moskowitz issued the February 25, 2016 order. (A2222-2223.) Had they been included on Akerman's call and obtained the new escrow order before – rather than after – the sale, these same orders would have preserved the entire $3 million in value for collection.

### Point III

**The Amended June 16, 2016 Order
Cannot Preclude the Knopfs' Due Process
Claims, Since it Was Issued *Sua Sponte*
Without Affording the Parties a Chance
to Oppose the Revision**

Though the *original* June 16, 2016 order denied the Knopfs' contempt motion, it could not possibly preclude the Knopfs' due process claim in this case,

since it did not state why the contempt motion was denied.  *Owens v. Treder*, 873 F.2d 604, 610 (2d Cir. 1989) (appellate order that did not set forth reasoning had no preclusive effect).

The Knopfs' claim to the proceeds of the sale was a chose-in-action, which is protected property under the due process clause. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-429 (1982).

Likewise, the Knopfs had a protected interest in the October 22, December 29, February 25, March 24 orders, and the original June 16 order, since those orders either protected or, in the case of the latter, did not impair the value of their chose-in-action.  *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 37 (1st Cir. 2006) rejected the argument "that a preliminary injunction cannot be a protected property interest because it is not yet a final judgment."  *Belaval* reasoned that since a chose-in-action is property, an interlocutory order that protects its value is likewise property.  *Id.* at 37 & n.4.

Even if the District Court's interpretation of the amended June 16 order were correct, and even if, in theory, an order subsequent to the procedural defect might retroactively cleanse prejudice, the amended June 16 order cannot be applied in that fashion. That is because it was issued *sua sponte*, and without affording the parties an opportunity to oppose the revision.   *Belaval* addressed this precise issue:

Even assuming that a court may on its own motion substantially modify the terms of a preliminary injunction to the substantial detriment of a party's property interest, . . . due process require[s] that *a court not do so without giving prior notice to the parties and an opportunity for them to be heard*.

*Id.* at 37 (emphasis added); *accord: Hayes v. Koch Entertainment, L.P.*, 292 Fed.Appx. 389, 390-391 (5th Cir. 2008); *Kingvision Pay-Per-View Ltd.*, 168 F.3d 347, 352 (9th Cir. 1999) ("[T]he [Court's] correction [reducing a money judgment] came out of the blue, with no notice to Kingvision or opportunity to be heard on the reduction. A judgment is property, so taking it away requires due process of law."); *accord: International Controls Corp. v. Vesco*, 556 F.2d 665, 668 n.2 (2d Cir. 1977)

Also, the June 16 amendment may have been triggered by the submission *in camera* of the Feldman/Akerman memos regarding Ringel's advice without any disclosure of Ringel's financial interest in the issue presented to her, or her marriage to one of Sanford's lawyers. (*See* pp. 27-28, *supra*.)  Rejecting the Knopfs' due process claim based on ruling that itself stemmed from a second fraudulent *ex parte* communication would be the height of unfairness. *Rodrigues v. City of New York*, 602 N.Y.S.2d 337, 343 (1st Dept. 1993) (order issued "after conducting an *ex parte* discussion with the prosecutors, *in camera*" did not have preclusive effect); *Chubb*, *supra*, 600 F.3d at 149 ("[T]he text of the orders that

were ultimately entered in 1986 does not speak to whether Chubb was afforded due process during the proceedings that led to [them].")

## Point IV

### The Knopfs Claims for Nominal and Punitive Damages Are Not Dependent on a Showing of Prejudice

If the Court finds that prejudice is not adequately alleged, it will confront the question that *Motors Liquidation* avoided, namely, whether a due process claim requires a showing of prejudice. 829 F.3d at 162.

*Stare decisis* weighs against requiring prejudice. *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86-87(1988) ("[I]t is no answer to say that in [a] particular case due process of law would have led to the same result because [the party] had no adequate defense upon the merits."); *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions."); *Krimstock v. Kelly*, *supra*.

If the prejudice allegations are inadequate, the §1983 claim should nevertheless be reinstated to permit the Knopfs to pursue nominal and exemplary damages and attorneys fees. *Farrar v. Hobby*, 506 U.S. 103, 112, (1992) (nominal damages and fees under §1988 are available even absent prejudice); *Smith v. Wade*, 461 U.S. 30, 34-35 (1983) (punitive damages available under §1983).

## Point V

## The Sanctions and Fees Award Should be Vacated

Under §1988: "The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees in favor of the defendant." *LeBlanc-Sternberg v. Fletcher,* 143 F.3d 765, 769 (2d Cir. 1998).

The District Court's July 25 decision recognizes that Akerman's calling Ringel directly made "more plausible the existence of a conspiratorial agreement among at least some of the defendants." (SA61-SA62.) The District Court's July 25 decision also recognized that prejudice might not be required at all. (SA63.) Dorsey prevailed because the District Court concluded that the Knopfs did not have a right to participate on Akerman's call to Ringel, a ruling that does not support sanctions given the dearth of authority for it. (Point I, *supra*.)

Dorsey's argument for sanctions was that the action was meritless, not that it multiplied proceedings, conduct within the purview of Rule 11, not §1927. *Latin America Finance Group, Inc. v. Pareja*, 2007 WL 1009506, *1 (S.D.N.Y., April 2, 2007) (Cote, J.); *Hill v. Clarke*, 2012 WL 13018385, *12 (N.D. Ga., Aug.16, 2016).

The Knopfs filed a complaint, and in conformity with the Court's August 15

order (A110), an amended complaint. They did nothing else, beyond responding to defendants' motions. "[A] lawyer cannot violate [§1927] in the course of commencing an action." *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 65 (1st Cir. 2008) ("[A]n unbroken band of cases . . . hold[s] that a lawyer cannot violate section 1927 in the course of commencing an action.")

The original filing in the Eastern District does not support §1927 sanctions, especially since the action was voluntarily re-filed in Southern District *to accommodate Akerman*, who believed it should be before Judge Cote. (A1512.) The Eastern District was a permissible and convenient venue, since the conspiracy arose there (A129,¶50-A131,¶152), and Esposito and Sanford reside there. *United States v. Muse,* 2007 WL 1989313, *15 (S.D.N.Y., July 3, 2007) (Cote, J.)

The March 5 ruling imposed $20,000 in sanctions against the Knopfs' attorney, Eric Berry, for what the District Court perceived to be dishonest or excessively aggressive conduct in discovery in *Phillips* and a marginally-related Nassau County action, neither of which involved Dorsey (except that Akerman was deposed in *Phillips*). In fact, following the sanctions award in this case, Phillips filed a copy-cat motion, which the District Court denied, even though most of the conduct alleged concerned his case. *Knopf v. Phillips*, 2018 WL 4080347 (S.D.N.Y., Aug.27, 2018)

The July 25, 2018 decision vacated these "inherent powers" sanctions (SA68), but, for the first time, cited the allegedly improper discovery activity as grounds for retaining the §1927 sanctions and §1988 award, even after the OCA report. However, since the allegedly improper discovery activity took place in either *Phillips* or the Nassau County action, it did not cause Dorsey to incur any fees or expenses, and cannot support an award under §1927 or §1988. Section §1927 sanctions, like §1988 awards, are "compensatory in nature – not punitive." *Six v. Generations Federal Credit Union*, 891 F.3d 508, 520 (4th Cir. 2018); *accord: Goodyear Tire & Rubber Co. v. Haeger,* 137 S.Ct. 1178, 1186 n.5 (2017).

## CONCLUSION

The Knopfs' §1983 claim should be reinstated, leave to amend to include allegations consistent with the OCA report granted, the sanctions and fee award vacated, and the case randomly reassigned to a different District Court judge.

Dated: New York, New York
        March 22, 2019

Berry Law PLLC                           /s/ Gary Greenberg
     /s/ Eric W. Berry                   Gary Greenberg, Esq.
By: _____                    666 Fifth Avenue, 27th Floor
     Eric W. Berry                       New York, New York   10103
745 Fifth Avenue, 5th Floor            (212) 765-5770
New York, New York  10151
(212) 355-0777

*Attorneys for plaintiffs-appellants Norma Knopf and Michael Knopf*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the foregoing brief is in 14-point proportionately-spaced Times New Roman type. According to the word processing system used to prepare this brief (WordPerfect X8 for Windows), the word count of the brief is 13,986, not including the table of contents, table of authorities, certificate of service and this certificate of compliance.

/s/ Eric W. Berry

_____

Eric W. Berry